## THE REFORM.

1. The act of July 13, 1861, "to provide *for the collection of duties on imports*, and for other purposes," and which by one section, on a proclamation by the President, makes intercourse between citizens of those parts of the United States in insurrection against its government, with citizens of the rest of the United States unlawful, "so long as such condition of hostilities should continue," was not a temporary act, though passed during the late rebellion; nor on the cessation of hostilities did forfeitures, which had been incurred, after proclamation, under that section, cease to be capable of enforcement.

2. The act of 13th February, 1862, by which a sum of money was appropriated "for the purchase of cotton-seed, under the superintendence of the Secretary of the Interior, for general distribution, provided that the said cotton shall be purchased from places where cotton is grown as far north as practicable," did not give power to the Secretary of the Interior to authorize an agent to transport merchandise to any district where the seed was to be got; such district having been then declared by proclamation, authorized by Congress, to be in a state of insurrection against the authority of the United States, and all intercourse with it prohibited, except where the President in *his* discretion might allow it in pursuance of rules prescribed by the Secretary of the *Treasury*.

3. Nor was a letter from the Secretary of the Interior to a person, which by its terms did no more than authorize and appoint him to "procure" a cargo of such seed "*in*" a prohibited or partially prohibited district (Virginia), and to "bring *it to*" a place not prohibited (Baltimore), even in its terms, such a license.

ON the 13th July, 1861, Congress passed "An act further to provide for the collection of duties on imports, and for other purposes." The late rebellion was in its rise at this time, but the act did not refer to it, nor was its operation declared, in any part of it, to be temporary.

By the 5th section it was enacted that "*whenever*" the militia called forth by the President had failed to disperse insurgents in any State against the national authority, it should be lawful for the President, by proclamation, to declare that the inhabitants of such State, or part of a State, were in "a state of insurrection against the United States;" and thereupon the statute proceeded,

"All commercial intercourse by and between the same and the citizens thereof, and the citizens of the rest of the United

States, shall cease and be unlawful *so long as such condition of hostility shall continue;* and all goods and chattels, wares and merchandise, coming from said State or section into the other parts of the United States, and all proceeding to such State or section by land or water, shall, together with the vessel or vehicle conveying the same, or conveying persons to or from such State or section, be *forfeited to the United States.*"[*]

The act contained, however, this proviso:

"That *the President* may in his discretion license and permit commercial intercourse with any such part of said State or section, the inhabitants of which are so declared in a state of insurrection, in such articles, and for such a time, and by such persons as *he*, in *his discretion*, may think most conducive to the public interest; and such intercourse, so far as by him licensed, shall be conducted and carried on *only* in pursuance of *rules and regulations* prescribed by the *Secretary of the Treasury.*"

Soon after the passage of this act, to wit, on the 16th of August, 1861, President Lincoln made such proclamation as the act itself authorized;[†] declaring that the inhabitants of several States, which he named, including Virginia— "except the inhabitants of that part of it lying west of the Alleghany Mountains, and of such other parts of that State, and the other States hereinbefore named, as may maintain a lawful adhesion to the Union and the Constitution; or *may be from time to time occupied and controlled by forces of the United States engaged in the dispersion of such insurgents,*"

" Are in a state of insurrection against the United States, and that all commercial intercourse between the same and the inhabitants thereof, with the exceptions aforesaid, and the citizens of other States and other parts of the United States, is unlawful, and will remain unlawful until such insurrection shall cease or has been suppressed; *that all goods and chattels, wares and merchandise, coming from* any of said States, *with the exceptions aforesaid*, into other parts of the United States, without the special license and permission of the President, *through the Secretary of the Treasury*, or *proceeding to* any of said States, with the excep-

---

tions aforesaid, by land or water, *together with the vessel* or vehicle conveying the same, or conveying persons to or from said States, with said exceptions, will be *forfeited to the United States.*"

From an early date of the insurrection certain persons in the loyal States were desirous, it seemed, to get cotton-seed from the South. And some of the executive departments—to which these persons addressed themselves—with a view of seeing how far northward this national staple could be profitably cultivated, had listened, it appeared, on particular occasions, with favor to the idea. The Treasury was apparently deterred, however, from giving much co-operation to any project of the sort, from its unwillingness to grant either passes or requests for passes, the effect of which might be to violate the blockade by which the government was then vigorously affecting the rebellious ports; and in January, 1862, an authority, not long previously granted by the then Secretary of the Treasury, upon the recommendation of high military persons, to one Smith, was on this account by him revoked.

Congress, however, a short time afterwards, to wit, on the 13th of February, 1862, passed—

" *An act making an appropriation for the purchase of cotton-seed for general distribution.*

" Be it enacted, &c., That there be, and is hereby, appropriated, out of any money in the treasury not otherwise appropriated, the sum of $3000 for the purchase of cotton-seed, and $1000 for the purchase of tobacco-seed, under the superintendence of the Secretary of *the Interior,* for general distribution; provided that the said cotton-seed shall be purchased from places where cotton is grown as far north as practicable."

Among the persons who wished to enter into this business of getting cotton-seed was Mr. William L. Hodge, of Washington City. On the 7th of March, 1862—*after* the passage of the above-quoted act of Congress,—he obtained from the Secretary of the Treasury a license " to employ a vessel to carry cotton-seed from any point on the waters of Virginia emptying into the Chesapeake Bay to the port of Baltimore;

*provided* that he, the said William, shall first execute a bond, with one or more sureties, to be approved by the Solicitor of the Treasury, in the penal sum of $20,000 conditioned that the vessel so employed shall *not transport to or from Baltimore or Virginia, any goods, wares, or merchandise, or supplies other than those actually required for the use of the crew thereof for one trip;"* and with a further proviso, among some others, " that one-half of the cotton-seed so obtained shall be furnished to the Secretary of the Interior at the cost thereof."

Of this license for some reason Mr. Hodge never availed himself. He gave no bond and the document remained a dead letter. He did, however, procure on the *next* day after the date of this license a letter, in these words, from the Secretary of the *Interior:*

DEPARTMENT OF THE INTERIOR,
March 8, 1862.

SIR: Congress having authorized this department to procure* cotton-seed for planting in the loyal States, I hereby authorize and appoint you to *procure a cargo of the same in Virginia, and bring it to Baltimore,* &c.

This letter will be your authority *to procure said seed,* and all parties in employ of the United States are respectfully requested to allow you to pass freely for said purpose.

I am, &c.,
C. B. SMITH,
Secretary.

W. L. HODGE, Esq.,
Washington City, D. C.

The Secretary of the Navy some time afterwards thus indorsed this letter:

NAVY DEPARTMENT,
April 25, 1862.

Naval officers in command of ships of war will respect the inclosed, and will afford protection in waters under their control and jurisdiction inside the capes of Chesapeake Bay.

G. WELLS.

---

* The word in the statute, as the reader will have noted, is to "purchase" cotton-seed.

In possession of the letter of the Secretary of the Interior, thus indorsed, Mr. Hodge entered into a contract with one Penniman, who it seemed had been associated in the former enterprise of Smith, to supply the Secretary with "cotton-seed under the recent act of Congress." In pursuance of this agreement Penniman loaded first a vessel called the Hunter, with which he went into prohibited districts, but brought back no cotton-seed, though he got some tobacco. He then loaded "The Reform," a schooner of fifty-seven tons, at Baltimore, with a cargo of a miscellaneous kind, well suited to a blockaded region,—several considerable items of which it was alleged were not on the manifest; though this document was sworn to as true. With this cargo the Reform *cleared* for Alexandria, a lawful port; and then *set sail* for Urbanna, in the eastern district of Virginia; a district then in insurrection against the United States, and so proclaimed by the President to be.* Before the vessel had got far she was seized by the revenue officers, brought back and libelled for forfeiture in the District Court for Maryland.

The libel set forth the act of 1861, the President's proclamation under it, and that this vessel was in the act of going to a prohibited district.

The answer which was put in by the claimant of the vessel, one Bailey, and by Penniman, owner of the cargo, admitted in the main these allegations; defending by matter in avoidance chiefly. It gave very interestingly a narrative of the project to get cotton-seed in the welfare of the country by different persons; of Smith and Penniman's failure; alleging various confidential interviews with officers of the government, military, naval, and civil; that *secrecy* was understood by all to be a matter indispensable to success; and also a diversion of public attention from what was really doing; and this—along with the fact that the respondents were informed at the Treasury when Smith's license was re-

* It did not appear that Mr. Hodge knew of the inconsistency of the manifest with the complete items of the cargo, or, indeed, of the clearance which had been made at the custom-house.

voked, that it was revoked because too much publicity had been given to his intention, and for no other reason—was assigned as the cause for the clearance to one port while the real destination was to another; a matter which it was said the military commander of the region, General Dix, was perfectly apprised of, though of course others generally were not; that at the time of the passage of the act of 1862, no part whatever of the cotton-growing country was occupied by forces of the United States; that the act, by its express terms, contemplated a purchase from places as far north as the staple grew; and that the point to which the voyage was directed, Urbanna, did answer and was the only place that did satisfy the requisitions by the act prescribed. A cargo was taken aboard, it was said, because the only currency at this time common to the northern and southern portions of the United States was gold, and because—there having been a universal· suspension of specie payments with an establishment of paper as a legal tender for almost everything—gold was an article of commerce as much as anything else, and specially dangerous from its now sudden mutations in market value to deal in at all; that it was necessary to take *something* which could be advantageously exchanged for cotton-seed; that the respondent, Penniman, selected such articles as he supposed would best effect the object of obtaining such seed. And the answer submitted that if the sending of such a mission into Virginia by the Secretary of the Interior under the authority of Congress was a lawful act, the enterprise had not become unlawful, and the goods intended to be used therein forfeited, because of a difference of opinion as to the details of the execution of such mission between the officers of the customs and the messenger of the government. The most that could be done was to reform such mission according to what might be determined to be its true object and scope, and not to impose a forfeiture for a mistake in construction of an act of Congress; especially in a matter where secrecy was of the essence and where the want of means to have full and clear understandings was so conspicuous.

The District Court dismissed the libel; and its decree was confirmed on appeal to the Circuit Court. The case was now here for review on appeal by the United States.

Between the time when the proceeding in the District Court was begun, and that when the case came here to be heard on appeal, the insurrection, in vigor when the libel was filed, had been in effect suppressed. The rebel armies had everywhere surrendered. The civil head of it was a prisoner of the United States, in one of its fortresses; and the whole insurrectionary combination was scattered and destroyed. Military forces were, however, still kept in parts of the rebellious region. The ancient order of things was not in all matters renewed. From the States lately in rebellion members were not yet received in Congress.

Before any argument on the merits, *Messrs. Thayer and Dobbin, for the appellees, claimants of the vessel and cargo,* moved to *dismiss the writ* on account of this termination of the insurrection. The act of Congress of 1861, so far as this matter was concerned, or more properly the proclamation under it, they argued, was of a temporary character. It was not a general provision without limitation as to its duration. Its very terms limited the duration of the restrictions on commerce to the term during which the " condition of hostility should continue." The rebellion was terminated. Of its termination the court would of course take judicial notice. The case then fell within *Yeaton* v. *United States* in this court,* and numerous other cases, establishing that a forfeiture incurred under a provision temporary in its character cannot be enforced after the expiration of the same.† In *Yeaton* v. *United States,* a schooner had been condemned below for a breach of an act of Congress prohibiting commerce with St. Domingo. The act was originally limited in duration to one year, and was afterwards continued until the end of the next session, when it expired. The case was pend-

---

* 5 Cranch, 281.

† Miller's case, 1 W. Blackstone, 451; and other authorities in support of it cited in Steamship Company v. Joliffe, 2 Wallace, 464–5.

ing in this court on appeal. The court, MARSHALL, C. J., held (i), that the case being here on appeal, was as a new case; and (ii), that the statute having expired, no penalty could be enforced for its violation.

*On the merits*, they reiterated, amplified, and enforced the grounds taken by the answer. Assuredly the act of 1862 authorized a purchase of cotton-seed. Such seed could be then had from no other place than a district in insurrection. If this was so—and the fact was not denied—the act of 1862 did, to some extent, qualify the act of 1861; not generally, not in all things, but *pro tanto*, and as to one narrow and particular thing; not generally even as to that, since the purchasing of the cotton-seed was put under the control of the Secretary of the Interior alone. The claimants require, for the purposes of their argument, no "repeal" larger than this; a very partial, limited, and special one; a qualification rather than a repeal.

If the Secretary had power to give a license to get cotton, his license authorized the use of convenient, and of the most convenient, means to get it.\* The whole matter was under his "superintendence,"—a large word. He could buy it and give gold. He could buy it and give merchandise. Gold was now merchandise, and merchandise only. It was not currency at all. What difference did it make—he having authority to buy, and of course to pay for—whether he paid in one sort of merchandise or in another?

Then what will be said of the authority by the Secretary of the Navy? Here is the head of the department giving an authority to pass!

The act of Congress, in short, conferred upon the Secretary of the Interior the performing a judicial act, and he having performed that act (whether this court may think he interpreted the act of Congress rightly or not), and other departments, like the Navy, having agreed with him in view, the citizen who reposed in the interpretation, and put his property at risk in accordance with it, is not liable to

---

\* See The Cornelia, Edwards, 360; The Freundschaft, 1 Dodson, 316.

have it confiscated, especially in a case where no wrong was consummated, and where the same act performed now would be both lawful and meritorious.

*Mr. Speed, A. G., and Mr. Assistant Attorney-General Ashton, contra.*

*As to the motion to dismiss.*

The act was not a temporary act in its terms, or in any true sense temporary at all. It remains in force for any future rebellion, if there should be one; and though this particular section may become practically useless at present, *if* the rebellion is fully suppressed, it does not cease to be effective so far as it has, by proclamation made under it, already operated. In *Yeaton* v. *United States,* the act was in its nature and by its terms temporary.

*As to merits.*

1. The act of 1861 gave no one but the President, through the Secretary, who was to establish "rules and regulations," power to license the trade. Hodge was aware of this, and applied to and obtained from the Treasury a license. *That* license he did not use. It did not suit him. It had conditions inconvenient for him to comply with, and which would have defeated his ends. He, therefore, on the next day after he saw that it was impracticable, and *not before*, applied for the license under which the vessel was freighted.

Now the act of 1862 gave the Secretary of the Interior no authority to purchase cotton-seed in *insurrectionary districts;* districts, that is to say, with which the President had prohibited all intercourse. It extended no further than to the purchase, and to remove it from regions in some way "excepted" by the proclamation. It said, simply, "take $3000 from the treasury, and with that money buy cotton-seed in the northernmost section of the cotton-growing country." It assumed that such purchase might be made lawfully; that is to say, without any intercourse with rebels. It was lawful to trade with persons in those districts "excepted" by the President in his proclamation. Parts were then loyal, and parts occupied. Our armies were successful from

the time that they became well organized. They were daily recovering the country. Intercourse with the portions permanently and completely under control, were within the President's exceptions. We so held in *The Venice.** Thus interpreted, the act of 1862 is quite consistent with the act and the proclamation of 1861. All remain in force. Authority to purchase the seed in the *prohibited* districts cannot be asserted, if it was possible to buy it elsewhere. If it was not possible to do this, then the case was simply that of an appropriation which it was not practicable to use, unless you suppose that the act of 1862 repealed the act of 1861. This cannot be argued. In express terms it does not repeal it. It does so as little by implication; a kind of repeal in no case favored, and in such a matter as this—purchasing from rebels—to be greatly disfavored; not to be *presumed* at all. But even stronger grounds remain; and we say:

2. If the act of 1862 did *pro tanto* repeal the act of 1861, and if the Secretary of the Interior had authority to direct a purchase of $3000 worth of cotton-seed from rebels, he yet had no authority to license the transportation of merchandise to districts declared to be in insurrection; obtaining, finally, from them with the proceeds—supposing which is a benignant supposition, that the merchandise was simply to be exchanged—a cargo of cotton-seed. That is a vastly different authority from the other. Every consideration of policy forbids such a broad construction of the act. So do the authorities;† and if the Secretary did by his letter of March 8th, 1862, mean to authorize Hodge to freight a vessel and carry a cargo to the rebels, and *thus* deal with them for cotton-seed, he meant to do what the act of 1862 never authorized. But,

3. He meant no such thing. He meant simply to authorize Mr. Hodge to purchase or buy the seed in Virginia; to go there in ballast, if he had to go with a vessel, and by water; but not to take a cargo of assorted merchandise to an insurrectionary district and there sell it, in order to raise

---

* 2 Wallace, 277.      † The Hoffnung, 2 Robinson, 167.

money.   Hodge could enter into no such enterprise as that, and not violate, at every step, the President's proclamation. If Hodge had not the money already, then he was not in a condition to make the purchase.   That was his affair.   A license to trade with an enemy is, of course, to be construed most strictly.   The party may trade *only* to the extent of the license.\*   Under the license it was lawful, if the party had the money, to purchase.   It was not lawful, if he had not money, to do unlawful things to get it.   The authority, as the other side construes it, would have given Hodge a power to trade almost indefinitely with the enemy, or to have done any other prohibited act, till he had raised money necessary to buy the cargo of seed.   The Secretary's letter says not one word of taking a cargo from Baltimore *to* Virginia.   It says only you may procure one "*in* Virginia and bring it to Baltimore."

On these two grounds alone the matter may safely rest. The indorsement of the letter by the Secretary of the Navy did not, of course, mean to confer a privilege not conferred by the Secretary of the Interior.   We need not discuss that. It protected the licensee only in the execution of such authority as the Interior conferred.   Certainly it had no power to relax the blockade in Hodge's behalf, or to license an intercourse prohibited by Congress and the President.

4. Independently of all this we may add what is certain, that no license to Hodge to trade with the enemy could authorize other persons to do so.   The license here, if it was a license, was not a general but a special one; and special licenses are never transferable.†   Hodge, for aught that appears, was a proper person.   It is plain that his transferees were not.

5.   The license, whatever it was, was exhausted by the Hunter's voyage.   With that completed, it became *functus officio*. But irrespective of the law of the case,

6. The enterprise of Penniman & Baily was an attempt

---

\* The Jonge Klassina, 5 Robinson, 265; The Juno, 2 Id. 118; The Cosmopolite, 4 Id. 12; The Jonge Arend, 5 Id. 19.

† The Jonge Johannes, 4 Robinson, 263; The Aurora, Id. 220.

at illicit trade. The whole facts point to this conclusion; and the wonder is, how two courts have agreed in viewing it otherwise.

Mr. Justice CLIFFORD delivered the opinion of the court.

Cause of seizure, as alleged in the libel of information, was that the vessel with her cargo was, on the seventh day of May, 1862, proceeding from the port of Baltimore, on a voyage to that part of the State of Virginia which was in insurrection against the United States, and which had been so proclaimed to be by the President of the United States. Allegations of the libel, so far as the charge is concerned, are founded upon the provisions of the 5th section of the act of the thirteenth of July, 1861, which, under certain conditions, conferred authority upon the President to declare, by proclamation, that the inhabitants of a State, or part of a State, falling within the category therein described, were in a state of insurrection against the United States. Whenever a State or part of a State was so proclaimed to be in a state of insurrection, the provision was, that thereupon all commercial intercourse by and between the same and the citizens thereof, and the rest of the United States, should cease and be unlawful, so long as such condition of hostility should continue. Purpose of the section was, in case of such insurrection, not only to interdict commercial intercourse, but to enforce the prohibition by forfeiture. Provision was accordingly made, that all goods and chattels, wares and merchandise, coming from said State or section into the other parts of the United States, and all proceeding to such State or section, by land or water, should, together with the vessel or vehicle conveying the same, or conveying persons to or from such State or section, be forfeited to the United States. Defence of the vessel and cargo is placed upon the same ground, and, therefore, it will not be necessary to give the respective claims a separate examination.

Decree of the District Court discharged the vessel and cargo, and dismissed the libel; and the Circuit Court, on

appeal, affirmed the decree. Libellants appealed to this court; and they now insist that the decree of the Circuit Court should be reversed, because, as they contend, the vessel and cargo are both justly forfeited, as alleged in the libel of information.

1. Before considering the merits of the controversy, however, it becomes necessary to examine the motion filed by the respondents to dismiss the appeal, which presents a preliminary question, and consequently should be first decided. Theory of the respondents is, that commercial intercourse with the States lately in insurrection is no longer unlawful; and inasmuch as there is no reservation in any act of Congress, nor in any proclamation of the President, whereby a liability for former violations of the law is continued and preserved, no condemnation of the vessel or cargo can now take place, and that the appeal ought to be dismissed. They contend that the act of Congress was a temporary act; because the restrictions upon commercial intercourse, as therein declared, were limited in duration, by the terms of the act, to the existence and continuance of actual hostilities; and the argument is, that hostilities having ceased, the act has expired, and, consequently, that the appeal cannot be sustained.

Respondents are correct in supposing that a forfeiture incurred under a penal statute, temporary in its terms, cannot be enforced after the statute has expired, and that the repeal of a penal statute has the same effect, unless the repealing law contains a saving clause as to pending prosecutions. Many authorities were cited in support of these propositions; but it does not seem to be necessary to give them much examination, as the propositions are elementary and undeniable. Granting all this, however, still it is quite evident that the motion cannot prevail, because the act of Congress under consideration was not a temporary act, as assumed by the respondents, nor has it ever been repealed. On the contrary, it is a general law without any limitation as to its duration, and is still in full force for the recovery of penalties, or for the enforcement of forfeitures incurred dur-

ing the insurrection, and before the termination of hostilities. Restrictions upon commercial intercourse were limited to the period of the continuance of hostilities, but there was no limitation as to the duration of the act of Congress. Cessation of hostilities restored the right of commercial intercourse; but the restoration of such intercourse could not have the effect to repeal the act of Congress which suspended such intercourse during the continuance of hostilities, or to exonerate a vessel or cargo from a forfeiture incurred for a violation of the restrictions while they were in full operation. Motion to dismiss the appeal is, therefore, overruled.

2. Principal defence upon the merits was, that the vessel, with the cargo, was engaged, at the time of the seizure, in a lawful voyage under a license from the Secretary of the Interior, issued by the express authority of the government. Claimants admit that the vessel, with the cargo, was proceeding, at the time of seizure, to the place specified in the libel of information, and that all commercial intercourse, not specially authorized by the government, between the States declared to be in rebellion and the rest of the United States, was prohibited and unlawful. Considering the nature and extent of the admissions as exhibited in the answer, it is clear beyond controversy that the burden of proof is upon the respondents to establish their defence.

Such a defence, unquestionably, may be valid, and, if fully proved, the decree of the Circuit Court must be affirmed. Authority was conferred upon the President, by a proviso of the section under consideration, to license and permit in his discretion commercial intercourse, in the interdicted States or places, in such articles, and for such time, and by such persons, as he might think most conducive to the public interest; but all such intercourse was to be conducted and carried on *only* in pursuance of rules and regulations prescribed by the Secretary of the Treasury.* Congress, also, on the thirteenth day of February, 1862, appropriated the sum

---

* 12 Stat. at Large, 257.

of three thousand dollars out of any money in the treasury not otherwise appropriated for the purchase of cotton-seed, and one thousand dollars for the purchase of tobacco-seed, under the superintendence of the Secretary of the Interior, for general distribution; but the provision was that the cotton-seed should be purchased from places where cotton was grown, as far north as possible.

3. Referring to those two acts of Congress, the claimants allege that the Secretary of the Interior appointed William L. Hodge to procure the cotton-seed as authorized in the place for which the vessel was embarked, and to which she was proceeding at the time of the seizure. They plead the letter of the Secretary of the Interior in their answer as a license and permit from the government, and as a document affording a full defence to the allegations of the libel. Substance of the letter is as follows: "Congress having authorized this department to procure cotton-seed for planting in the loyal States, I hereby authorize and appoint you to procure a cargo of the same in Virginia, and bring it to Baltimore, this department to have the privilege to take such portion of said cargo as it may require, not exceeding one-half, at the actual cost and charges." Statement of the letter also, was, that it "will be your authority to procure said seed," and contained a request to all parties in the employment of the United States to allow the appointee to pass freely for that purpose. Answer of the claimants also shows that the Secretary of the Navy, on the twenty-fifth day of April following, indorsed the letter of appointment in the terms following, to wit: "Naval officers in command of ships of war will respect the inclosed, and will afford protection in waters under their control and jurisdiction inside the capes of Chesapeake Bay."

4. Sufficiency of the defence is denied by the United States upon various grounds, but in the view taken of the case there is no necessity of examining more than two of the series. 1. They deny that the Secretary of the Interior had any authority under the appropriation act to license or permit the transportation of merchandise from any loyal State

to any section of a State declared and being in insurrection, in order that the same might be there sold for the purpose specified or for any other purpose. 2. Purport of the second proposition is, that the Secretary of the Interior, by his letter of appointment to William L. Hodge, did not authorize and did not intend to authorize him, or any one, to transport merchandise for that or any other purpose, to any State or section of a State with which commercial intercourse was prohibited.

1. Proclamation of the President of the sixteenth of August, 1861, which declared that certain States and parts of States were in insurrection, expressly excepted from that condition those districts, or parts of the same, which might be "from time to time occupied and controlled by the forces of the United States engaged in the dispersion of the insurgents." Intercourse for commercial purposes was not prohibited with such places or districts while so occupied and controlled. They were not regarded, as this court said, in the case of *The Venice*,\* " as in actual insurrection, or their inhabitants as subject in most respects to treatment as enemies."

Such intercourse, however, with any such State, place, or district, so occupied and controlled, was absolutely forbidden, unless the person or persons conducting it were furnished with a license and permit of the President, and conformed in all respects to the treasury rules and regulations. Respondents do not pretend that the Secretary of the Interior possessed any power under those provisions to grant any license or permit for any such adventure as that which is the subject of the present controversy, and it is clear that the pretence, if set up, could not for a moment be sustained, as the power is expressly vested in the President, and the requirement was that any commercial intercourse carried on under such a license and permit, should be conducted in conformity to the regulations of the Treasury Department.

Want of power, therefore, in the Secretary of the Interior,

---

\* 2 Wallace, 277.

is clearly shown, unless it be made to appear that those provisions had been modified or repealed before the date of the letter under which the claimants attempt to justify. Express repeal.is not set up, and the pretence of implied repeal has no better foundation. Repeal by implication, upon the ground that a subsequent provision upon the same subject is repugnant to the prior law, is not favored in any case; but where such repeal, if admitted, would operate to the prejudice of the government, the supposed repugnancy ought to be clear and controlling before it can be held to have that effect.*

Instead of the last provision being repugnant to the former, the truth is that the two are entirely consistent. Whole effect of the subsequent provision was, that it appropriated the sum of three thousand dollars for the purchase of cotton-seed under the general superintendence of the Secretary of the Interior for general distribution. Purchase of the cotton-seed, it is presumed, might have been made in the districts or places within the insurrectionary States, which were occupied and controlled by our military forces, or at all events, the conclusion is a reasonable one that such were the views of Congress when the appropriation was made. Presumption is that Congress did not intend to relax the existing restrictions upon commercial intercourse with the States or districts declared to be in insurrection, because there is not a word or phrase in the act indicating any such intention. Condition of affairs was well known to Congress at that period, and it is to be presumed that those who voted for the approriation act and directed the purchase of the cotton-seed, if they had intended to relax the commercial restrictions as a means of facilitating the purchase, would have employed appropriate language to signify that intention Nothing of the kind is expressed in the appropriation act, and consequently there is no repugnancy between that act and the prior provision which established the commer-

---

* United States v. Walker, 24 Howard, 311; Wood v. United States, 16 Peters, 363.

cial restrictions, and prohibited commercial intercourse to the place where the vessel in question with the cargo was bound at the time of the seizure.

2. Second proposition of the appellants is, that by the true construction of the letter under which the claimants attempt to justify, it did not give to the appointee, or any one else, any authority whatever to transport a cargo of merchandise from Baltimore to the place where the vessel was bound at the time of the seizure. Admission of the answer, it will be remembered, is, that the vessel was bound to the place alleged in the information, and that the place, as there alleged, was one of the places declared by the President to be in a state of insurrection. Question here presented is one of construction, but the court, in determining it, may look at the surrounding circumstances and the subject-matter, as well as at the language employed in the instrument. Legal presumption is, that the author of the letter, inasmuch as he was a public officer, intended to perform his duty, and that he did not intend to violate the law of the land. Three thousand dollars, out of any money in the treasury not otherwise appropriated, were placed at his disposal for the purchase of cotton-seed for general distribution.

Directions in the act making the appropriation were, that he should make the purchase from places where cotton was grown, as far north as possible; but the presumption is, that he had full knowledge of the then existing commercial restrictions, and that the appropriation act, under which all his authority was derived, did not in terms repeal or in any manner modify or relax those restrictions. Satisfactory evidence that the Secretary of the Interior and his appointee had such knowledge, is exhibited in the record. First application for the license was made to the President. Pursuant to that application, the Secretary of the Treasury, on the seventh day of March, 1862, granted a license and permit to the same William L. Hodge, and the recital of the document is, that it was granted with the approbation of the President, and by virtue of the power conferred by the act under which the forfeiture of the vessel and cargo is now

claimed. Power conferred was, that the licensee might em-
ploy a vessel to carry cotton-seed from any point on the
waters of Virginia, emptying into Chesapeake Bay, to Balti-
more, provided he gave bond in the penal sum of twenty
thousand dollars, conditioned that the vessel so employed
should not transport, either way, any merchandise or sup-
plies, other than those actually required for the use of the
crew for one trip; or convey any person, letter, or informa-
tion, or in any way aid or comfort those in rebellion. Al-
though this license was never used by the licensee, still it is
proper to refer to it as showing the views of the govern-
ment, and as affording conclusive evidence that the licensee
knew that the commercial restrictions, established under the
prior act, were unrepealed and in full force.

Dissatisfied with the license and permit granted by the
Secretary of the Treasury, with the approbation of the Presi-
dent, the licensee proceeded to the Department of the In-
terior, and there obtained the letter under consideration.
Introductory recital of the letter is not quite correct, but in
determining what is the true construction of the document,
it is proper to weigh the language as it is written. Sub-
stantial statement of the author of the letter is, that he is
"authorized to procure cotton-seed for planting in the loyal
States," and that in consequence thereof, he authorizes and
appoints the licensee to procure a cargo of the same in Vir-
ginia, and bring it to Baltimore, on the conditions therein
named. He says nothing about transporting cargo to the
place of destination, or about bringing back any other cargo
than the cotton-seed. No allusion is made to the existing
commercial restrictions, nor any intimation given that they
would be modified or repealed. Applying the usual rules
of construction to the letter, the conclusion must be that it
conferred no authority whatever upon the licensee to trans-
port any merchandise to the port or place where the vessel
was bound at the time of the seizure.

5. Evidence of authority in William L. Hodge to embark
in any such adventure being entirely wanting, it is unneces-
sary to examine the question whether the license, if valid,

and sufficiently comprehensive in its terms to protect the licensee, would afford any justification to the claimants.

6. Grounds of the decision, as already stated, render it unnecessary, also, to examine the question of fraud, or to remark·upon the evidence respecting the prior voyage.

Decree·of the Circuit Court is therefore reversed, and the cause remanded, with directions to enter a decree of forfeiture against both the vessel and cargo.

DECREE ACCORDINGLY.