72 U.S. 630 (____)
5 Wall. 630
THE SEA LION.
Supreme Court of United States.

*637 Messrs. W.M. Evarts and Henry Flanders, for the claimants, appellants in the case.
Mr. Ashton, Assistant Attorney-General, and Mr. Cushing, contra.
*642 Mr. Justice SWAYNE delivered the opinion of the court.
The vessel and cargo were captured and condemned as *643 prize of war. The appellants seek to reverse the decree upon the ground that both were protected by a license. The validity and effect of the alleged license is the main question to be considered. Before proceeding to examine that subject, there are several other features of the case which invite remark and must not be passed by in silence.
The vessel was fitted out and loaded at Mobile, which was then enemy territory, and in a state of stringent blockade. The cargo consisted of two hundred and seventy-two bales of cotton, and seven barrels of turpentine. She left Mobile on the 8th of May, 1863, under the Confederate flag. She had no other. About 12 o'clock in the night of the 9th of May, and about four miles southeast from Fort Morgan, she was discovered, fired upon, stopped, seized, and sent to Key West, where the decree of condemnation was subsequently pronounced.
Netto was her captain, and Yocum the supercargo. There were on board, besides them, a crew of seven men and two passengers. Certain papers were found which passed into the hands of the captors, and to which it is proper to advert.
The ship's register set forth that it had been sworn by M.D. Eslava, that Yocum & Hohenstein, a firm in Mobile, under the name of J. Hohenstein & Co., were the sole owners of the vessel. The shipping articles engaged the crew to navigate the vessel from Mobile to Havana. The manifest sworn to by Netto, stated that the cargo was intended to be conveyed to that port. The Spanish consul certified that the goods named in the manifest, were on board and destined for Havana. The clearance, signed by the deputy collector, was for the same place. A letter from Oliver & Worne introduced Yocum to Brott, Davis & Shons, of New Orleans, and expressed the hope that lively business transactions between the two houses would follow. Another letter from the same firm to Pilcher, the President of the Bank of New Orleans, asked him to aid in Yocum's business, which it was said Yocum would explain to him. A memorandum, signed by Hohenstein & Co., stated that Yocum *644 had credit on their books for $150,000, and for $17,000, subject to a settlement between him and Hohenstein. The paper, relied upon as a license, was also found on board, and delivered over by Yocum to the captors. After the vessel was libelled, a claim was interposed by Netto and Yocum in behalf of Brott, Davis & Shons. It is under oath, and states that they believe the vessel and cargo are the property of that firm. Yocum states that he was put in charge of the cargo by one Worne, whom he believes to be a partner of Brott, Davis & Shons. They further say that the vessel was bound in good faith to New Orleans, there to deliver her cargo in pursuance of the license.
Brott and Davis gave their affidavit in preparatorio. They insist upon the license, and allege that it was their intention to cause the vessel and cargo to be taken to New Orleans. They aver that they are loyal citizens, and that no enemy of the United States had any interest in the vessel or cargo. The affidavit is very full as to the procuring and transmission of the alleged license, and as to the loading of the vessel at Mobile by their agents; but is wholly silent as to who are the owners, and does not allege the whole or any part of the ownership to be in themselves. Under the circumstances, this omission can hardly be deemed accidental. It has very much the appearance of the caution of a special plea. Netto and Yocum were also examined in preparatorio.
They repeat their belief as to the ownership, except that Netto states the turpentine to have belonged to himself and the crew. Netto also states, that after they had passed Fort Morgan, Yocum told him New Orleans was their destination, and that he would have obeyed Yocum's order to take the vessel there. Yocum testifies that he was only supercargo, that he was to receive $500 for his services, and that he had no interest in the property. He said further, that from what he had heard Worne say in Mobile, his understanding was, that the vessel and cargo belonged to Brott, Davis & Shons, and Oliver & Worne. His instructions were to proceed to the mouth of the Mississippi  thence to communicate with Brott, Davis & Shons, and to await orders from *645 them. Hubbel, one of the passengers, in his examination in preparatorio, says that the clearance was taken for Havana as a blind to enable the vessel to get away. Yocum told him at Mobile that she was going to New Orleans. As evidence of Yocum's intention to take her to the blockading fleet, he says, that when she started the wind was so low that she could not make more than two miles an hour, and that hence it was difficult to prevail on the pilot to take her out.
In regard to the important fact last mentioned the captain and supercargo are wholly silent.
In the light of this testimony, it is difficult to resist the conclusion that the vessel left Mobile, with alternative purposes; one, if possible to evade the blockading fleet and make Havana; the other, if intercepted and seized, to set up the license and insist upon the pretext, that she was proceeding, under its authority, in good faith to New Orleans. As we shall not place our judgment upon this ground, it is unnecessary further to pursue the subject.
The license relied upon is as follows:
 CUSTOM HOUSE, NEW ORLEANS,
 COLLECTOR'S OFFICE, February 16th, 1863.
The United States military and other authorities at New Orleans permit cotton to be received here from beyond the United States military lines, and such cotton is exempt from seizure or confiscation. An order is in my hands from Major-General Banks approving and directing this policy. The only condition imposed is that cotton or other produce must not be bought with specie.
All cotton or other produce brought hither from the Confederate lines by Brott, Davis & Shons will not be interfered with in any manner, and they can ship it direct to any foreign or domestic port.
 GEORGE S. DENISON,
 Special Agent of the Treas. Dep't and Acting Collector of
 Customs.
 Approved. D.G. FARRAGUT,
 Rear Admiral.
The effect of this paper depends upon the authority under *646 which it was issued. The fifth section of the act of July 13th, 1861, authorized the President to proclaim any State or part of a State in a condition of insurrection, and it declared, that thereupon all commercial intercourse between that territory and the citizens of the rest of the United States, should cease and be unlawful, so long as the condition of hostility should continue, and that all goods and merchandise coming from such territory, into other parts of the United States, and all proceeding to such territory by land or water, and the vessel or vehicle conveying them, or conveying persons to or from such territory, should be forfeited to the United States: "Provided, however, That the President may, in his discretion, license and permit commercial intercourse with any such part of said State or section, the inhabitants of which are so declared in a state of insurrection, in such articles, and for such time, and by such persons, as he, in his discretion, may think most conducive to the public interest; and such intercourse, so far as by him licensed, shall be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury."
There is no other statutory provision bearing upon the subject, material to be considered.
On the 16th day of August, 1861, the President issued his proclamation declaring the inhabitants of the rebel States, including Alabama, to be in a state of insurrection.
On the 28th of the same month the Secretary of the Treasury, pursuant to the provisions of the act referred to, issued a series of regulations upon the subject of commercial intercourse with those States.
These regulations continued in force until the 31st of March, 1863, when a new series were issued by the same authority. The former were in force when the alleged license bears date; the latter when the vessel and cargo left Mobile and when they were captured. It is unnecessary to analyze them. It is sufficient to remark, that they contain nothing which affords the slightest pretext for issuing such a paper. It is in conflict with rules and requirements contained *647 in both of them. It finds no warrant in the statute The statute prescribes that the President shall license the trade. The only function of the Secretary was to establish the rules by which it should be regulated, when thus permitted. The order of General Banks is not produced. If it were as comprehensive as the special agent assumed it to be, it covered shipments to New Orleans from Wilmington, Charleston, and all other points in the rebel States. It embraced merchandise, coming alike from places within, and places beyond his military lines. With respect to the latter it was clearly void. The President only could grant such a license. Mobile was then in possession of the enemy. The vessel and cargo bore the stamp of the enemy property. The paper relied upon was a nullity, and gave them no protection. They were as much liable to capture and condemnation as any other vessel or cargo, leaving a blockaded port and coming within reach of a blockading vessel.
The decree below was rightly rendered, and it is
AFFIRMED.
Mr. Justice GRIER:
I do not concur in this judgment. The vessel went out of Mobile by permission of the commander of the blockade there. To condemn such property would be a violation of good faith. No English court has ever condemned under such circumstances.