THOMAS SNELL & others *vs.* DANIEL A. DWIGHT & others.

Suffolk. Nov. 20, 1874. — March 1, 1876. DEVENS & LORD, JJ., absent.

The provisions of the U. S. St. of 1864, *c.* 225, §§ 8, 9, and of the treasury regula-
tions of July 29, and September 24, 1864, respecting purchases of the products
of the then insurgent states, and commercial intercourse with their inhabitants, did
not authorize any such intercourse, excepting by the agents of the United States
appointed to make such purchases. Nor did they authorize such agents to contract
for such products with citizens of the states not in rebellion, nor for such products
not, at the time of the contract, actually owned or controlled by the vendor.

Under the U. S. St. of 1864, *c.* 225, §§ 8, 9, and the treasury regulations of July 29,
and September 24, 1864, no officer of the United States government, civil or mil-
itary, had authority to grant permission to any person to take goods beyond the
lines of the military occupation of the United States, for trade or exchange for the
products of the insurgent states.

A bill in equity cannot be sustained by one of the parties to a contract for illegal
trading with inhabitants of states declared in insurrection against the United-
States government, against another party to such contract, for an account of re-
sulting profits.

BILL IN EQUITY by Thomas Snell, Samuel S. Keith and Abner
Taylor, members of the firm of Snell, Taylor & Co., against
Daniel A. Dwight, Benjamin F. Nourse and George M. Gill, for
an account. Hearing before *Ames*, J., who ruled that the bill
could be maintained, and referred the case to a master. The de-
fendants appealed. The facts of the case appear in the opinion.

*A. A. Ranney*, for the plaintiffs.

*C. B. Goodrich & E. F. Hodges*, for the defendants.

ENDICOTT, J. In March, 1865, the defendant George M. Gill
made an agreement with Samuel Tate to bring a steamboat into
the Yazoo River in Mississippi, within the confederate lines,
laden with supplies to be exchanged for cotton. Tate was to
furnish the cotton, in payment for the supplies, under an ar-
rangement which he had made with the confederate govern-
ment through its cotton agent, and he was to receive one half
the profits of the transaction. On March 7, 1865, Gill made a
contract in writing with the plaintiffs, the owners of the steam-
boat S. B. Young, then lying at Memphis and laden with sup-
plies, to proceed up the Yazoo River, and execute the agreement
made with Tate. This contract purports to be made on the one
part by Snell, Taylor & Co., the plaintiffs, and on the other by
the defendants, under the name of Dwight, Gill & Co. The con-

tract also recites that Dwight, Gill & Co. have contracted with Charles H. Ray of Chicago for the use of permits, issued to him by the President of the United States, to enable them to take the goods beyond the military lines of the United States. The details of the contract, prescribing the manner of its execution, the sum to be paid for the supplies, and the share of the profits to be paid the plaintiffs for the use of their boat and other services, it is not important to recite.

Under this contract the boat proceeded under the charge of Gill up the Yazoo River, beyond the military lines of the United States, and obtained from Tate, in exchange for the supplies, two hundred and seventy-five bales of cotton. She also took on board as freight, on account of Tate and others, four hundred and twenty-four bales of cotton, making a total cargo of six hundred and ninety-nine bales which she conveyed to St. Louis.

The plaintiffs bring this bill, alleging that the two hundred and seventy-five bales of cotton were taken and disposed of by the defendants, and praying for an account, and that the defendants may be compelled to pay over to the plaintiffs the money and profits which they are entitled to receive by the terms of their contract. The defendants, among other defences, set up that the contract was unlawful, and the plaintiffs can have no remedy under it.

The parties contemplated by their contract, and, in its execution, actually carried on trade and had commercial intercourse within a state in insurrection against the laws of the United States. By the act of Congress, passed July 13, 1861, and the proclamation of the President in pursuance thereof, August 16, 1861, all commercial intercourse by and between the states in rebellion and the citizens thereof and citizens of the rest of the United States was declared to be unlawful. A state of war was thus declared by competent authorities to exist. U. S. St. 1861, c. 3, § 5; 12 U. S. Sts. at Large, 257. See *Kershaw* v. *Kelsey*, 100 Mass. 561, and cases cited. At the time this enterprise was undertaken, it was therefore illegal, unless the plaintiffs can show that it was duly authorized and permitted by the authorities of the United States, in conformity to the provisions of the statutes allowing commercial intercourse with the enemy under certain restrictions and regulations.

It is contended by the plaintiffs that the defendants were licensed to proceed up the Yazoo River and procure the cotton under certain permits issued by the authorities of the United States and duly assigned to them. These permits are three in number, and are known and referred to in the record as the Ray, Topp and Swett permits.

Before considering the character of these licenses, it is necessary to examine how far trade could be permitted with the citizens of states in rebellion, under the statutes and regulations then in force.

Under the U. S. St. of 1861, *c.* 3, § 5, the President could license and permit commercial intercourse with any such part of the section of a state declared to be in insurrection, as he in his discretion might think conducive to the public interest; and such intercourse, so far as licensed by him, was to be carried on in pursuance of rules prescribed by the Secretary of the Treasury. In the rules as revised and published, September 11, 1863, by the Secretary of the Treasury, rule VII. provided as follows : " Commercial intercourse with localities beyond the lines of military occupation by the United States forces is strictly prohibited; and no permit will be granted for the transportation of any property to any place under the control of insurgents against the United States." So far as that act and the regulations under it are concerned, there could be no license to trade on the Yazoo River as provided in the contract.

The act passed July 2, 1864, *c.* 225, § 8, (13 U. S. Sts. at Large, 377,) provided that the Secretary of the Treasury might " authorize agents to purchase for the United States any products of states declared in insurrection, at such places therein as shall be designated by him, at such prices as shall be agreed on with the seller, not exceeding," &c. The treasury regulations, issued July 29, 1864, rule III., declared, " Commercial intercourse with localities beyond the lines of actual military occupation by the United States forces is absolutely prohibited, and no permit will be granted for the transportation of any property to any place under the control of insurgents." This rule is substantially the same as rule VII. promulgated September 11, 1863.

Additional regulations under this act were issued September 24, 1864, providing for the appointment of agents to purchase

for the United States the products of states declared to be in insurrection, at certain designated places, all of which were within the federal lines, and for certain prices and on certain terms of payment set forth in the regulations. These agents were required by rule VII. to purchase all such products offered to them, but not to assume any liability on account of the government previously to their delivery other than by a stipulation to purchase products " owned or controlled by applicants." The form of the stipulation is annexed to the regulation, and is a certificate that the agent has " agreed to purchase," &c. The regulations also recite with great minuteness the duties of agents in regard to the products delivered under the certificate of purchase, the terms on which they shall be sold, and the records to be kept of all transactions. And in rule VIII., whenever any person shall make application to the purchasing agent setting forth that he owns or controls such products, the agent is directed to give him a certificate that such application had been made, and request safe conduct for such applicant and the necessary transportation.

On the same date the President issued his proclamation, reciting the act of Congress and the regulations of the treasury department, in which it is declared that all persons having in their possession such products, and all persons owning or controlling such products, are authorized to convey them to either of the designated places of purchase, and such products shall not be liable to detention, seizure or forfeiture while *in transitu.* And it also declared that persons who have so sold and delivered products to agents, as provided by the regulations, and having a certificate thereof, may purchase at the place of sale, or in any other place in a loyal state, any articles not contraband of war nor prohibited by the war department, to an amount not exceeding in value one third the aggregate value of the products so sold by him to the agent; and " articles so purchased may be transported by the same route and to the same place from and by which the products sold and delivered reached the purchasing agent," and such articles are to have safe conduct by military and naval officers to the said places and by the same route.

The regulations and proclamation of September 24 do not conflict with the regulation of July 29, which prohibits trade with

localities beyond the military lines of the United States, and declares that no permits shall be issued for the transportation of property to any place under the control of insurgents. The regulations are to be construed together, and the provision of July 29 is so far modified, that purchases may be made through agents, from persons residing in the insurrectionary states, and property may be transported thither if purchased with the proceeds of products sold to agents of the government, according to the statute, the regulations and the proclamation made in pursuance thereof. The prohibition against trading with inhabitants of insurrectionary districts at localities beyond the military lines of the United States, and the transportation of property beyond those lines for the purposes of trade, continues in force to the same extent as provided under the St. of 1861.

From this review of the laws and regulations in force in March, 1865, when this contract was made, it appears that no officers of the government, civil or military, had authority to give permits to trade beyond the lines of military occupation by the forces of the United States; or to give licenses to trade to citizens of the states not in rebellion. The statute of July 2, 1864, and the regulations in pursuance thereof, were only intended to authorize purchases by the government itself from persons who resided in the insurgent states, and who owned or controlled the products of those states; which products it was thought desirable and important to obtain. No intention is there expressed, or to be implied, that the officers of the government should extend the privilege of private trading with the enemy to our own citizens. The careful provisions of the treasury regulations show that it was intended that the government alone was to be the purchaser and have control of the cotton when delivered. And the clause in the proclamation of the President, that the seller may purchase within our lines merchandise to a limited extent, which was not contraband of war, and return with safe conduct to the same place and by the same route that the Southern products were brought, shows that the privilege could be availed of by the insurgents only. *United States* v. *Lane*, 8 Wall. 185. *Maddox* v. *United States*, 15 Wall. 58. The several permits, therefore, under which the plaintiffs contend that the contract was lawfully executed, were unauthor-

ized, and had no effect to make the contract or the enterprise to the Yazoo River lawful; nor could the contract have been executed under any permits then authorized to be issued.

The Ray permit, referred to in the contract, is therein said to be a permit issued by the President, authorizing Ray to take such goods beyond the national military lines. The permit is not in evidence, and there is no proof of its contents beyond what appears in the contract. If the permit was such as it appears to be by the language of the contract, it was clearly unlawful. The President had no authority to issue such permit by any act of Congress or regulation of the treasury, and no permit of any description could be granted to a citizen to obtain cotton beyond the federal lines.

But it is said that the cotton was in fact procured under certain permits obtained from one Topp, and referred to as the Topp permits. These are not put in evidence, and we have no means of ascertaining their purport, except that they were permits to bring out cotton. In the absence of any evidence of their contents, but taking them to be permits for this purpose, as appears by the evidence, they are open to the same objection as the Ray permit.

The Swett permit, so called, which is in evidence, was more formal, and was an attempt to comply with the form prescribed by the treasury regulations of September, 1864. Risley, a treasury agent, made an agreement with Swett to purchase 50,000 bales of cotton; and the orders for safe conduct were duly issued by the President. But Swett was a citizen of Illinois in December, 1864, when the agreement was made; and the assignment of the agreement, if valid or within the intent of the regulations, was to the defendants, who were not insurgents. Nor did Swett or the defendants own or control, at the time of the issue or assignment, any products of the states in rebellion, but contracted with Tate to procure the cotton through his connection with the cotton agent of the confederate government. A similar transaction by the same agent was held not to be justified under the statute, the regulations of the treasury or the proclamation of the President. *United States* v. *Lane, ubi supra.*

The questions involved in this discussion have been considered in repeated decisions of the Supreme Court of the United States.

*The Reform,* 3 Wall. 617.   *The Sea Lion,* 5 Wall. 630.   *The Ouachita Cotton,* 6 Wall. 521.   *United States* v. *Grossmayer,* 9 Wall. 72.   *Cutner* v. *United States,* 17 Wall. 517.   *United States* v. *Lapène,* 17 Wall. 601.   *Sprott* v. *United States,* 20 Wall. 459.

The contract, therefore, and the expedition up the Yazoo River had relation to trade with the public enemy in time of war, prohibited alike by public law and by the statutes and regulations of the United States in force at the time.

But it is contended that the contract has been executed, and this bill may be maintained under the authority of *Brooks* v. *Martin,* 2 Wall. 70.   Without considering how far that case is in accordance with the current of authority on this question, it is clear that it bears no resemblance to the case at bar.

This is a bill founded upon the illegal contract itself, and seeks directly to enforce the provisions of that contract in regard to the distribution of the alleged profits arising out of the execution of the unlawful undertaking.

It is well settled that when a contract is illegal and prohibited by law, no action can be maintained upon it in law or equity, either to enforce its obligations or to secure its fruits to either party; and where a party cannot maintain his action without showing an illegal act on his part, he must fail in his suit.   And it has been directly held that contracts for the purpose of illegal trading, or of trading in an enemy's country in time of war, cannot be the foundation of an action.   In *Evans* v. *Richardson,* 3 Meriv. 469, a contract was entered into between an American citizen and an English subject for trading with America during time of war, and the court, of its own motion, declined to enforce it.   In *Stewart* v. *Gibson,* 7 Cl. & Fin. 707, an American ship was fitted out in Liverpool and sent to Africa on a joint adventure for trafficking in slaves.   An English ship was sent at the same time by the same parties, with arms and ammunition, to be at the disposal of the supercargo of the American ship.   On arrival of the two ships, the arms and ammunition were put on board the American ship, and she was afterwards seized and condemned.   It was held that the transaction was illegal, and that no action for contribution or account could be maintained, in regard thereto, by any of the parties concerned, against the others.

See Coll. Part. (5th Am. ed.) §§ 56 *& seq.* ; 1 Lindl. Part. (3d ed.) 187, 209 ; *Griswold* v. *Waddington*, 16 Johns. 438; *Coppell* v. *Hall*, 7 Wall. 542; *Jecker* v. *Montgomery*, 18 How. 110, and cases there cited in regard to trading with the enemy. The same principle applies where goods are smuggled. *Biggs* v. *Lawrence*, 3 T. R. 454.

In *Armstrong* v. *Toler*, 11 Wheat. 258, 271, it was said by Chief Justice Marshall : " Questions upon illegal contracts have arisen very often both in England and in this country ; and no principle is better settled than that no action can be maintained on a contract, the consideration of which is either wicked in itself or prohibited by law. How far this principle is to affect subsequent or collateral contracts, the direct and immediate consideration of which is not immoral or illegal, is a question of considerable intricacy, on which many controversies have arisen, and many decisions have been made." In that case, Armstrong, in time of war, contrived a plan for importing goods on his own account from the enemy. The goods were consigned to Toler, and Armstrong promised to pay him any sum for which he might become liable if the goods should be condemned. On this promise it was held that Toler could maintain an action. And it was said in the opinion : " It cannot be questioned, that however strongly the laws may denounce the crime of importing goods from the enemy in time of war, the act of defending a prosecution instituted in consequence of such illegal importation is perfectly lawful. Money advanced by a friend in such a case is advanced for a lawful purpose, and a promise to repay it is made on a lawful consideration. The criminal importation constitutes no part of this consideration." But if the importation was the result of a scheme between the parties, or if Toler had an interest in the goods, or if they were consigned to him with his privity, that he might protect or defend them for the owner, then the promise to pay would be void. " The point of law decided is, that a subsequent independent contract, founded on a new consideration, is not contaminated by the illegal importation, although such illegal consideration was known to Toler when the contract was made, provided he was not interested in the goods, and had no previous concern in their importation." See *Tenant* v. *Elliott*, 1 B. & P. 3 ; *Farmer* v. *Russell*, 1 B. & P. 296 ; *Thomson* v

*Thomson*, 7 Ves. 470 , *McBlair* v. *Gibbes*, 17 How. 232 ; *Kins-man* v. *Parkhurst*, 18 How. 289. *Dyer* v. *Homer*, 22 Pick. 253, and *Harvey* v. *Varney*, 98 Mass. 118, have some bearing on this question.

The cases of *Tenant* v. *Elliott* and *Thomson* v. *Thomson* illustrate the rule laid down in *Armstrong* v. *Toler* ; in the first, it was held that the action could be maintained; in the second, that it could not. In *Tenant* v. *Elliott*, the defendant, a broker, effected insurance for the plaintiff, which was in violation of the navigation laws, and illegal. A loss happened, and the underwriters paid the money to the broker, and, on action brought, he set up the illegality as a defence. But the plaintiff recovered on the implied promise, arising out of the receipt of the money for the plaintiff, as a new contract not affected by the illegality of the original transaction. In *Thomson* v. *Thomson*, there was a sale of the command of an East India ship to the defendant upon the consideration that he should pay to the plaintiff £200 annually while he remained in command. The contract was illegal, but an allowance having been made to the defendant on retiring, the bill was filed to have a portion of the allowance invested to satisfy the annuity. But it was refused, on the ground that there was no claim to the money, except through the illegal agreement; the money was paid to the party ; if it had been paid, the court say, to a third person, (as in *Tenant* v. *Elliott*,) the plaintiff might have recovered, for the third person could not have set up this objection to performing the trust. The Master of the Rolls, Sir William Grant, said : " There is nothing collateral in respect of which, the agreement being out of the question, a collateral demand arises."

Applying, therefore, the rule of *Armstrong* v. *Toler* to this class of cases, it is clear that in the case at bar there is a fatal disability in the plaintiffs, which prevents them from asking the aid of a court of equity to enforce the contract upon which this bill is founded. The cases of *Brooks* v. *Martin*, 2 Wall. 70, and *Sharp* v. *Taylor*, 2 Phil. Ch. 801, upon which case *Brooks* v. *Martin* rests as its principal authority, relate to subsequent or collateral contracts and transactions, in which the original illegal acts and contracts are held to form no part of the consideration. In *Sharp* v. *Taylor*, the doctrine of *Tenant* v. *Elliott* was carried

somewhat farther, and held to apply to a partner, who, having, by collusion with an agent of the partnership, possessed himself of the property of the firm, was not allowed to show that, in realizing it, the provisions of an act of Parliament had been violated. The distinction between enforcing illegal contracts, and asserting title to property, that has arisen therefrom, was fully considered by the court, and the case was held to fall within the rule laid down in *Tenant* v. *Elliott*, *Farmer* v. *Russell*, and recognized in *Thomson* v. *Thomson*. The decision distinctly states that the bill does not seek to enforce an agreement adverse to an act of Parliament or to recover compensation or payment for an illegal voyage, and that those questions were settled by the payment of the money over by the agent to the defendant, who held as tenant in common with the plaintiff, and who cannot dispute a title that is common to both. Taking into view the fact that the defendant was the partner of the plaintiff in the original enterprise from which the money accrued, and the difficulty of reaching him except through the illegal partnership transactions, the soundness of the decision may be open to question; but, assuming that the distinction upon the facts made by the court is correct, it is sustained by the authorities.

Mainly on the authority of that case, *Brooks* v. *Martin*, 2 Wall. 70, was decided, and Mr. Justice Miller, in delivering the opinion of the court, says: "That the principle is the same in both cases, and that the analogy in the facts is so close, that any rule on the subject which should govern the one ought also to control the other." The parties entered into a partnership, the object being the "purchase and sale of bounty land warrants, that may have been or may be issued under the law of Congress." The law provided that warrants for land should be issued to soldiers engaged in the Mexican war; and, to protect the soldier, it declared that any sale or contract made prior to the issue of such warrants should be null and void. U. S. St. 1847, *c.* 8, § 9. 9 U. S. Sts. at Large, 125. The money was to be furnished by Martin; the business was to be conducted by Brooks. Martin advanced the money, and it was invested by Brooks in the purchase of warrants which were sold or located; and there came into the hands of Brooks land, money, notes and mortgages, the result of the partnership business, the original capital of which

Martin had advanced. In this state of facts, Martin sold his in-terest to Brooks for a small and utterly inadequate consideration, being induced to do so by the fraud, concealment and misrepre-sentation of Brooks, as to the value of the property in his hands ; and the bill was brought to set aside that sale on the ground of fraud. It was not to enforce the original contract, which was un-lawful, but to set aside a subsequent agreement entered into be-tween the parties, whereby one partner fraudulently obtained pos-session of the whole property. And it was decided that Brooks could not set up the original illegality, arising out of the purposes for which the partnership was first formed, as a defence; that Brooks was not only the partner of the plaintiff, but, owing to the manner in which the business was conducted, he was his special agent in its management ; that the purchase made by him of Martin's interest must be governed by the rules which govern such transactions as between principal and agent ; and that the law governing such fiduciary relations must apply, and the contract of sale be set aside. The case may be open to the same criticism, as to the application of the rule, as has been sug-gested in regard to *Sharp* v. *Taylor, ubi supra ;* but as it is so clearly to be distinguished from the case at bar, it is not neces-sary to consider that question. And it may be, as the soldier alone could take advantage of the illegality, and avoid the sale by himself of a land warrant before it was issued, the titles under such warrants being good, that the case would fall within the principle laid down in *Harvey* v. *Varney,* 98 Mass. 118. It was there held that a contract, executed or executory, for the convey-ance of real or personal property to conceal it from attachment, while voidable by creditors, was good between the parties, though both shared in the fraudulent intent ; and the fraudulent char-acter of the purpose of a partnership as to creditors was no de-fence to a bill in equity by one of its members against the others for a settlement of the affairs of the firm. In that case the court remarked that " *Brooks* v. *Martin* adopts principles far more ex-tensive than those we have found it necessary to affirm for the de-cision of the present cause." See *Dyer* v. *Homer,* 22 Pick. 253.

The bill seeks to enforce directly an illegal contract, and to secure its fruits to the plaintiffs, and cannot be maintained. It is therefore unnecessary to consider the other questions raised upon the report and argued at the bar.          *Bill dismissed.*