**DAW INDUSTRIES, INC., Plaintiff,**

**v.**

**UNITED STATES, Defendant.**

**Court No. 80–11–00013.**

United States Court of
International Trade.

Jan. 20, 1983.

Tanaka, Walders & Ritger, Washington, D.C. (Wesley K. Caine, McLean, Va., at the trial and on the brief), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C. (Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Barbara M. Epstein, New York City, at the trial and on the brief), for the defendant.

FORD, Judge:

Plaintiff in this action is seeking the court's determination as to the proper classification of certain prosthetic sheaths and socks designed to be used by amputees wearing artificial limbs. The sheaths were classified under Item 382.78, Tariff Schedules of the United States, which provides:

Other women's, girls', or infants' wearing apparel, not ornamented:
\* \* \* \* \* \* \*
Of man-made fibers:
382.78      Knit . . . . . . . . . . . . . . . . . . . . . . . 25¢ per lb. + 32.5% ad val.

The socks were classified under Item 382.58, TSUS, which reads:

Other women's, girls', or infants' wearing apparel, not ornamented:
\* \* \* \* \* \* \*
Of wool:
\* \* \* \* \* \* \*
382.58      Other . . . . . . . . . . . . . . . . . . . 37.5¢ per lb. + 20% ad val.

Plaintiff contends the sheaths and socks are properly within the language "other prosthetic articles" and subject to classification under Item 709.57. Tariff Schedules of the United States, which provides as follows:

Orthopedic appliances, surgical belts, trusses, and similar articles; artificial limbs, eyes, teeth, and other prosthetic articles; splints and other fracture appliances:
\* \* \* \* \* \* \*
709.57      Other . . . . . . . . . . . . . . . . . . . . . . . . . 10% ad val.

The record consists of the official papers which were received in evidence without being marked, fifteen exhibits received on behalf of plaintiff, and thirteen for defendant, as well as the testimony of three witnesses each on behalf of the parties.

Plaintiff's first witness, Mr. Hugo Belzidsky, president of the plaintiff corporation, testified that plaintiff's business is the importation of prosthetic articles from France. His duties involve the importing, purchasing, distributing, marketing and promotion of said merchandise.

The witness is familiar with the imported merchandise which consists of sheaths, socks and washing bags, as well as combination packages which contain a prosthetic sock, prosthetic sheath and washing bag. The prosthetic sheath and sock match in terms of size. Mr. Belzidsky testified that his father designed the imported articles and holds a patent for them. The involved merchandise was designed to overcome the problems of the amputee, such as skin abrasion, torque of the skin and flesh, and problems relating to perspiration. According to the witness the sheath is worn directly over the residual limb in a wrinkle-free manner, and the sock is worn directly over the sheath. The sheath and sock are folded over the top of the artificial limb. According to the witness the sheath has elasticity in the width but not in the length which is for the purpose of controlling the amount of compression on the residual limb and to control the friction on the residual limb when the amputee is walking. The sheath also allows the perspiration to pass from the skin to the sock. The sheath has a soft mesh inside and a coarse mesh on the outside. The former is designed to avoid scratching of the residual limb, and the coarse mesh on the outside is used to grip the sock so the two articles will work together.

The sock, according to the witness, has a soft mesh on the inside and a coarse mesh on the outside. The soft mesh on the inside grips the coarse mesh on the outside of the sheath so they will work together to promote a "gliding" effect. The coarse mesh on the outside will help grip the artificial limb to permit an interconnection. The witness testified that the sock is made of wool on the inside and synthetic fiber on the outside, thus permitting the inner side to absorb perspiration and keep the residual limb dry. The synthetic fiber on the outside maintains the elasticity and compression which is necessary. Mr. Belzidsky testified that the Daw socks come in different thicknesses, because the residual limb changes in volume due to weight and fluid changes. The different thicknesses are necessary to compensate for changes in the residual limb. This is done by filling the gap and permitting a proper fit.

The witness then identified Plaintiff's Exhibit 5 as a suction sheath, which is worn by amputees capable of wearing a suction socket prosthesis. According to the witness the sheath supplements the skin at the weight-bearing point, eliminating abrasion and friction on the residual limb.

The witness testified that the merchandise sold by plaintiff is to certified prosthetists, private laboratories, hospitals, and the Veterans' Administration. They are not sold in clothing stores or department stores. The merchandise, according to the witness, is advertised in professional journals, thus bringing the merchandise to the attention of prosthetists and medical doctors. According to the witness the merchandise has been certified and approved by the Veterans' Administration, and there was received as Plaintiff's Exhibit 10 an evaluation of the imported merchandise by the Veterans' Administration.

The washing bag, according to Mr. Belzidsky, which is contained in the combination packs, is necessary since the sheath and sock must be washed on a daily basis. The bag provides protection in the laundry process.

On cross examination, Mr. Belzidsky stated he was not familiar to any great extent with ladies' nylon stockings or knee-highs, and thus did not know whether such articles could be considered prostheses. The witness indicated he was qualified to fit a prosthetic sock and sheath but not an artificial limb. In his opinion a prosthetic sock is a prosthesis, and agreed with the definition contained in *Dorland's Illustrated Medical Dictionary,* 26th ed. 1981.

The witness testified the Daw socks have been manufactured for about fifteen years. He was aware there are other manufacturers of stump socks but was unable to state how long they have manufactured the merchandise or whether they are made of 100 percent wool. The witness was aware that a sock manufactured by Knit-Rite, Inc. is made in different thicknesses, but he was unable to confirm whether other brands were also made in different thicknesses. A sock, according to the witness, may be worn without a sheath. The witness indicated a sock manufactured by plaintiff may be worn with any other brand of sheath. The witness further stated that the sock and sheath replace human skin or flesh, notwithstanding the fact that skin performs many functions not performed by the sock or sheath.

Plaintiff then called Dr. Hans R. Lehneis, director of orthotics and prosthetics at the Institute of Rehabilitation Medicine at New York University Medical Center. A resume of Dr. Lehneis, received in evidence as Plaintiff's Exhibit 11, indicates that he holds a Ph.D in biomechanics and is a certified prosthetist and orthotist. The witness also has a number of patents covering prosthetic and orthotic devices and is author and co-author of over fifty professional publications.

The field of prosthetics, according to Dr. Lehneis is "the replacement or substitution of parts of the human body". The field of orthopedics relates to the field of prosthetics in that the orthopedic surgeon amputates and the prosthetist replaces the amputated part or organ. A prosthesis, according to the witness, is "a replacement or

substitute for a part of the human body that's either lost or the patient is born without it". A person wears a prosthesis for one or two basic reasons, or a combination of the two, i.e., to regain functional loss due to amputation, and for cosmetic purposes.

Dr. Lehneis testified that limbs, organs, soft tissue and skin can be replaced by prostheses which do not always look like the parts of the body they replace, i.e., a hook that replaces a hand. The sheath and sock are necessary since the skin that covers the residual limb was not intended to be walked upon, consequently it is substituted by adding different materials, such as the sock and sheath to allow weight-bearing to take place on the skin.

The witness indicated that one specific function performed by the sheaths and socks is to permit the donning of prostheses, as well as to take up space to perfectly match the residual limb. These articles also provide cushioning. The sock and sheath provide a hygienic effect permitting perspiration to be absorbed and compensate for fluctuations in the size of the residual limb. The cushioning effect, according to Dr. Lehneis, is analogous to the cushioning of the plantar surface of the foot (sole).

He then testified that the prosthetic socks and sheaths, in his opinion, replace an identifiable part or parts of the human body, that is the plantar of the foot. Accordingly, he would regard these articles to be prostheses.

On cross-examination Dr. Lehneis admitted that skin performs functions not performed by socks and sheaths, such as perspiration and regeneration. He would not regard bandages as prostheses. He further stated the socks can be worn without sheaths and one brand sock can be worn with another brand of sheath. It was his opinion that women's knee-high stockings cannot be worn in lieu of a prosthetic sheath.

Plaintiff's final witness was Dr. S. William Levy, a dermatologist. A resume of Dr. Levy's background was received in evidence as Plaintiff's Exhibit 12. The wit-

ness testified that amputees wearing artificial limbs have special skin problems and disorders. Dr. Levy separated the skin problems into two categories, i.e., mechanical and environmental. The mechanical problem relates to the rubbing and piston action, causing abrasion of the skin of the residual limb. The piston action is the result of up and down movement of the artificial limb. According to the witness the residual limb has a tendency to change in size and volume. As a result mechanical injuries may occur since the residual limb becomes tighter or looser in the socket of the artificial limb. Dr. Levy testified further that the stump skin is different from other skin because it is "poikilthermic" (it picks up the environmental temperature).

The environmental type of injuries are disorders resulting from perspiration. Amputees are prone to excessive perspiration since they have lost a substantial portion of the entire body surface. As a result the amputee is subject to various skin disorders of the residual limb, such as oozing and maceration of the skin with a true dermatitis and a red reaction. There can also be fungus and bacterial infections.

According to Dr. Levy any material which could replace the skin, such as a prosthetic sock and sheath, would be helpful in preventing mechanical type injuries. The sheath would eliminate abrasion and would compress the skin of the residual limb, preventing swelling and resulting disease. The prosthetic sock, according to the doctor, cushions the residual limb and provides for comfort, as well as absorbing perspiration.

Dr. Levy testified that he was familiar with the imported merchandise and they were in his opinion prostheses, within his understanding of the term and the definition contained in *Dorland's Illustrated Medical Dictionary,* infra.

On cross-examination Dr. Levy testified that a sock is not utilized on a residual limb when the skin is broken. When this occurs the condition must be corrected before continuing use of the prosthetic sheaths and

socks. The sheaths and socks do not manufacture skin but they do provide compression and cushioning to the amputee. Dr. Levy indicated that chemicals are used today as a substitute for human skin.

The witness agreed that skin performed functions that are not performed by prosthetic socks and sheaths, such as gland secretion and sweating. Prosthetic socks can be used without sheaths but, according to his experience, 100 percent of the patients treated within the past year wear prosthetic socks. Dr. Levy indicated that ladies stockings are not worn by amputees instead of prosthetic sheaths and that all wool prosthetic socks have been used for many years to provide comfort and absorb perspiration.

On re-direct examination, Dr. Levy testified the plantar portion of the human foot provides a cushioning and gliding effect, and that the prosthetic socks and sheaths perform a similar function for an amputee who wears an artificial limb. From a functional point of view, the socks and sheaths perform a function analogous to that performed by the flesh of a person's foot.

Defendant's first witness, William Smith, president of Knit-Rite, Inc., testified that he is responsible for the operation of the firm, its marketing, finances, and the manufacture of prosthetic socks and other articles. Mr. Smith is a graduate of the University of Missouri and a certified orthotist. His firm's 100 percent wool prosthetic sock was received in evidence as Defendant's Exhibit F, and he testified the item is available in different plys and sizes. It serves as an aid to an amputee, provides comfort, helps position the residual limb in the socket of the artificial limb, cushions, absorbs perspiration and protects against abrasion and rubbing. His company sells its socks to prosthetic facilities, hospitals and the Veterans' Administration. Knit-Rite socks are advertised and referred to in ads as "prosthetic socks or Super-Socks". In the opinion of the witness the Knit-Rite prosthetic socks are essentially the same as the imported merchandise.

The witness testified that Knit-Rite sheaths are made from stretch yarn which permits stretching in both length and width. A Knit-Rite prosthetic sheath was received in evidence as Defendant's Exhibit J. According to the witness the sheath is used to provide comfort, allow perspiration to pass through and be absorbed by the sock. Mr. Smith testified that amputees wore ladies stockings prior to the development of prosthetic sheaths. He stated socks may be worn without sheaths and any brand of sock or sheath can be used interchangeably.

The witness described the Knit-Rite sock as tubular in shape, with a tapered closed end, which is narrower at the toe than at the top and is worn by an amputee over a residual limb in the same manner as a non-amputee might wear a foot sock. According to Mr. Smith the socks manufactured by his company come in over 120 sizes and in three different plys. Mr. Smith is familiar with the plaintiff's merchandise, since Knit-Rite, Inc. was the distributor of the Daw sheath in the 1960's.

In his opinion a prosthetic article is a prosthesis, which is an item replacing a missing part of the human body, such as an artificial leg, arm, eye, ear, nose or finger. A stump sock or sheath is not considered by the prosthetic industry to be a prosthetic article since it does not replace a missing part of the body. It is in his opinion merely wearing apparel worn by an amputee.

On cross-examination Mr. Smith stated that the intent of the stretch in the sheath is to create a wrinkle-free fit and that there are minimal compression qualities in the Knit-Rite sheath.

Dr. Alan Smith, chief of orthopedic surgery at the Veterans Hospital in Brooklyn, and attending orthopedic surgeon at the Downstate University Medical Center in Brooklyn, and Kings County Medical Center in Brooklyn was called by defendant. Dr. Smith is also assistant professor of orthopedic surgery at Downstate University Medical Center and has lectured at New York University School of Orthotics and Prosthetics. Dr. Smith is a certified diplomat of the American Board of Orthopedic Surgery and also a member of the American Board

of Certification in Orthotics and Prosthetics.

In his position as supervisor of the amputee clinic at the Veterans Administration Hospital, the witness is charged with the duty of prescribing prostheses for patients who have had amputations and supervises their follow-up care. It is his understanding that the term prosthetic article is a prosthesis, which is a fabricated substitute for a missing body part, such as limbs, eyes and teeth. In his opinion prosthetic sheaths and socks are wearing apparel for amputees and are not prostheses since they do not constitute a substitute for a missing body part.

Dr. Smith further testified that a sheath is used in order to decrease friction between the amputee's skin and the stump sock which is usually worn over the sheath. According to the witness a sheath is not essential since many amputees have artificial limbs which fit and thereby cause no substantial friction between the stump and the socket. In Dr. Smith's opinion only ten percent of amputees wear sheaths, and many patients wear ladies' nylon stockings and knee-high socks since they perform the same function as a sheath and are less expensive. An examination of the imported sheath and the Knit-Rite sheath by Dr. Smith resulted in his conclusion that both perform the same function, that is, as items of wearing apparel. The sheath is not a substitute for missing skin or tissue, according to the witness, since it does not resemble it in consistency, nor does it perform the functions of skin. According to the witness there is no difference in function between the Knit-Rite sock and the Daw sock, and either can be used without a sheath or interchangeably with other brands. On cross-examination Dr. Smith testified that he has prescribed the Daw socks, and that prosthetic socks do absorb and prevent friction in the same manner as the socks of a person wearing shoes.

The last witness called on behalf of defendant was Mr. Milton Katz, a semi-retired textile engineer who has been associated with the domestic prosthetic industry for thirty-three years. Mr. Katz still engages in consulting work and was formerly general manager of Bessco Holding Corporation, which manufactures prosthetic socks and other types of surgical knitwear. Prior to that he had been president of Bessco Industries, Inc. which also manufactures prosthetic articles known as prosthetic socks or stump socks. Mr. Katz testified that Bessco manufactures a prosthetic sock which consists of wool and orlon.

According to the witness Bessco manufactures a five-ply 100 percent wool sock which is made in six different plys. The function of the sock is to protect the limb, absorb perspiration and fill the space between the natural skin and the socket of the artificial limb. Bessco sells its prosthetic socks throughout the United States to the Veterans Administration, prosthetic limb dealers, surgical supply houses and certain hospitals.

Upon examination of the involved merchandise (Plaintiff's Exhibit 2) the witness stated he was familiar with such merchandise having seen it at trade shows and having been given one by an amputee for evaluation. In comparing Exhibit 2 with the Bessco sock, Exhibit L, the witness stated that the Daw sock (Exhibit 2) contains wool and other fibers, while the Bessco sock is 100 percent wool, but, insofar as use is concerned, they are the same.

Mr. Katz did not consider the imported prosthetic sock to be unique since it performs the same function as the Bessco sock or the Knit-Rite sock. Based upon his experience, Mr. Katz testified that it his understanding that the term prosthetic article would be a prosthesis. A prosthesis, according to the witness, is a manmade appliance used on the body in place of a lost part of a human body. In his opinion a prosthetic sock or sheath would not be considered by the trade to be a prosthetic article since it does not replace a human lost part. Mr. Katz believed a prosthetic sock is considered in the trade to be a stocking which is worn by an amputee in order to permit an artificial limb to be used comfortably. It was his considered opinion that a

prosthetic sock or sheath would not be considered in the trade a replacement for skin or tissue.

On cross-examination the witness testified that none of the Bessco items in evidence are patented. An examination of the patent covering the imported merchandise involving a combination of wool and other fibers does not in the judgment of the witness make that article unique.

Based upon the record plaintiff contends the imported socks and sheaths are prostheses or, alternatively, prosthetic articles. Defendant contends the socks and sheaths are not prostheses, and the provision for prosthetic articles encompasses only those which are prostheses.

A prosthesis is defined in *Dorland's Illustrated Medical Dictionary, infra,* a portion of which was received as Defendant's Exhibit B, as "an artificial substitute for a missing body part, such as an arm or leg, eye or tooth, used for functional or cosmetic reasons, or both". It is readily apparent from the foregoing that the imported articles do not fall within the above definition.

Plaintiff's alternative contention for prosthetic articles appears to be based upon the theory that the merchandise is utilized as an adjunct to the prosthesis. It is evident that the imported sheaths and socks are articles, and that they are designated and known in the trade as prosthetic sheaths and socks. However, the court is convinced the provision for "other prosthetic articles" utilized in Item 709.57 was intended to encompass only prostheses.

The basic function of the court is to construe the statutory provision, so as to carry out the intent of the legislature. *Sandoz Chemical Works, Inc. v. United States,* 43 CCPA 152, C.A.D. 623 (1956). When a tariff provision is not defined in the Tariff Schedules of the United States or established by legislative history, the correct meaning of the term is the common meaning understood in the trade and commerce. *United States v. Rembrandt Electronics, Inc.,* 64 CCPA 1, C.A.D. 1175, 542 F.2d 1154 (1976). The common meaning of a tariff term is not a question of fact but one of law. The testimony of witnesses may be considered but is not binding. The court may utilize extrinsic aids, such as lexicographic authorities, in ascertaining the common meaning. *Transatlantic Co. v. United States,* 60 CCPA 100, 471 F.2d 1397 (1973); *Schott Optical Glass, Inc. v. United States,* 67 CCPA 32, C.A.D. 1239, 612 F.2d 1283 (1979).

*Dorland's Illustrated Medical Dictionary,* Twenty-sixth Edition, defines "prosthetic" as follows:

> prosthetic serving as a substitute; pertaining to the use or application of prostheses.

prosthesis is defined as follows:

> *Webster's Third New International Dictionary:*
>
> prosthesis * * * 2: an artificial device to replace a missing part of the body (as a suction socket to replace a lower leg or a dental restoration)
>
> *Funk & Wagnalls Standard Dictionary,* International Edition:
>
> prosthesis * * * 2. *Surg.* The fitting of artificial parts to the body, as a glass eye, a false tooth, etc. 3 Replacement or substitution of parts.

The Summaries of Trade and Tariff Information published subsequent to the enactment of TSUS, while not evidence of Congressional intent, may be used as evidence of administrative practice. It is interesting to note the following information contained in the 1969 Summaries (Schedule 7, Volume 2), with respect to articles covered by Items 709.54 through 709.57:

> This summary includes a variety of orthopedic and fracture appliances and prosthetic articles used in the professional practice of medicine and dentistry. Many types of these articles are required to be custom made or fitted. Three groups of items are covered: (1) orthopedic appliances, surgical belts, trusses and the like; (2) artificial limbs, eyes, teeth, and other artificial parts of the body; and (3) splints and other fracture appliances. The first group of appliances is employed to prevent or correct deformities of the

body. It covers orthopedic appliances for animals as well as for humans, but it excludes protective devices such as saddle blankets, shin pads for horses (see item 790.30 in summaries volume 7:1), and football safety equipment (see item 734.72 in summaries volume 7:4). The second group includes artificial parts used to replace defective parts of the body. Such replacement parts usually resemble the real ones in appearance. The third group covers items employed to immobilize injured parts of the body or for setting fractures. It includes plates, nails, and other materials inserted inside the body to hold together two parts of a broken bone or for similar treatment of fractures. Appliances which form inseparable parts of hospital beds (see item 727.04 in summaries volume 7:5) are excluded.

The second group of items referred to in the above indicates the provision for other prosthetic articles was intended to encompass "other artificial parts of the body". The commission further states that "The second group includes artificial parts used to replace defective parts of the body. Such replacement parts usually resemble the real ones in appearance." While it is plaintiff's contention that the sheaths and socks are in effect replacement skin, they do not have the appearance of skin.

■ Based upon the record there are certain articles considered to be prostheses other than artificial limbs, eyes or teeth. However, it is apparent that not every article used in conjunction with an artificial limb is in fact a prosthesis.

■ The prosthetic sheaths and socks do not fall within the common meaning of the tariff term prosthetic articles. Accordingly, plaintiff has not established Item 709.57 to be the proper classification for said merchandise.

■ Defendant urges the use of the doctrine of ejusdem generis as an aid to the statutory construction of Item 709.57. Said doctrine may be utilized when doubt arises as to whether an article not named is or is not in the class of an article named. *Merck*

*& Co. v. United States,* 19 CCPA 16, T.D. 44852 (1931). The articles specifically named in Item 709.57 in the phrase prior to "other prosthetic articles" are "artificial limbs, eyes and teeth". Prosthetic socks and sheaths are not of the same class or kind as the enumerated articles which are replacements for missing or defective parts as indicated *supra.*

■ The classification of wearing apparel carries with it a presumption of correctness. 28 U.S.C. § 2639(a)(1) (1980). By virtue of the presumption it is presumed that all facts necessary to support the classification have been found. The record establishes the involved prosthetic socks and sheaths were designed to be worn over the residual limb of a person using a prosthesis. The use of a sock increases comfort, cushions the residual limb, absorbs perspiration and protects the limb from abrasion. The sheath also aids in the comfort of the person wearing the artificial limb, allows perspiration to pass through it out to the sock, minimizes friction and assists in the proper fitting by adding cushioning. In view of the foregoing uses the question presented is whether or not the imported articles are wearing apparel, or more than wearing apparel.

■ It is obvious the imported articles are designed to be worn and, therefore, fall generally within the class or kind of articles considered to be wearing apparel. However, all things worn by humans are not necessarily wearing apparel. In *Best v. United States,* 1 Ct.Cust.Appls. 49, T.D. 31009 (1910), the court pronounced the above principle. The merchandise therein was an ear cap for children designed to hold the ears back to prevent disfigurement. In *Antonio Pompeo v. United States,* 40 Cust.Ct. 362, C.D. 2006 (1958), crash helmets were held not to be wearing apparel. On the other hand in *Admiral Craft Equipment Corp. v. United States,* 82 Cust.Ct. 162, C.D. 4796 (1979), the court held certain plastic lobster bibs used in restaurants to protect the clothes of the diner as wearing apparel.

 The use of the socks and sheaths by a person using a prosthetic device does not fall within the exclusions in *Best* and *Pompeo*. While the imported articles are not the type worn by people not using artificial limbs they, nevertheless, fall within the category of wearing apparel for those using such devices. Where a provision in the Tariff Schedules contains no limitation, it is deemed to include all forms of the article provided, which in this case includes wearing apparel for such persons.

In view of the holding that the classification is correct, the question of whether the sheaths and socks are entireties for tariff purposes is moot.

In view of the foregoing, plaintiff's action is dismissed. Judgment will be entered accordingly.