DAW INDUSTRIES, INC., Appellant,

v.

The UNITED STATES, Appellee.

Appeal No. 83–833.

United States Court of Appeals,
Federal Circuit.

Aug. 9, 1983.

Wesley K. Caine, Washington, D.C., argued for appellant. With him on brief was Donald L.E. Ritger, Washington, D.C.

Barbara M. Epstein, New York City, argued for appellee. With her on brief were J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, New York City, Atty. in Charge, Trade Field Office.

Before BALDWIN, MILLER, and SMITH, Circuit Judges.

EDWARD S. SMITH, Circuit Judge.

Appellant Daw Industries (Daw) appeals the decision of the Court of International Trade (C.I.T.)[1] which upheld the classification of the imported merchandise as women's wearing apparel, Items 382.78 and 382.58, T.S.U.S.,[2] instead of prosthetic articles, Item 709.57, T.S.U.S. We reverse.

## I.

The imported merchandise consists of two items—a nylon sheath worn on the stump of an amputee's residual limb and a wool "sock" that fits over the sheath—which are used to improve the fit between an amputee's residual limb and the socket of an artificial limb. While it is possible to wear an artificial limb without the sheath and sock, the evidence is uncontroverted that their use has many beneficial effects for the wearer. In particular, the sheath and sock reduce skin diseases of the residual limb by permitting perspiration to evaporate from the residual limb even while placed in the socket of the artificial limb. Also, the sheath and sock cushion the torque and piston action caused by, for example, walking, which the residual limb is not naturally designed to withstand.

Upon importation, the Customs Service classified the merchandise as other women's, girls', or infants' wearing apparel, Item 382.78, T.S.U.S. (knit man-made fibers), for the sheaths, and Item 382.58, T.S.

U.S. (wool), for the socks. Daw took the position that the sheaths and socks should both be classified under Item 709.57, T.S. U.S., which reads:

> Orthopedic appliances, surgical belts, trusses, and similar articles; *artificial limbs, eyes, teeth, and other prosthetic articles;* splints and other fracture appliances:
>
> \*     \*     \*     \*     \*     \*
>
> Other \* \* \*. [Emphasis supplied.]

Specifically, Daw claims that the sheaths and socks are "other prosthetic articles" either in the sense that they are themselves *prostheses,* that is, actual replacements for a body part, or, alternatively, that they are *prosthetic* articles, in that they are used in conjunction with and relate to prostheses.

The C.I.T. upheld the Service's classification. It held that the sheaths and socks are not prostheses; that as such they are not other prosthetic articles because that term only refers to other prostheses; and that they were correctly classified as women's wearing apparel. We agree with the C.I.T. on the first point but reverse on the last two.

## II.

### A.

The first question we must address is whether the merchandise is a prosthesis, and our immediate task is to determine the meaning of prosthesis.[3] This is a question of law. We agree with the C.I.T. that a prosthesis is an artificial substitute that replaces a missing body part.[4] While obviously a prosthesis need not perform all of the functions of the original part—an artificial eye, for example, cannot see—the prosthesis must provide some of the functions of the natural member which would otherwise

1. *Daw Indus., Inc. v. United States,* 561 F.Supp. 433 (C.I.T.1983).

2. Tariff Schedules of the United States, 19 U.S.C. § 1202 (1976).

3. The term "prosthesis" is not actually used in Item 709.57, T.S.U.S., but both parties and the C.I.T. agree that Item 709.57 includes at a minimum any prosthesis (except as elsewhere provided for).

4. *Daw Indus.,* 561 F.Supp. at 439–40. *See* Dorland's Illustrated Medical Dictionary (26th ed. 1981); *id.* (24th ed. 1965); *id.* (22d ed. 1951); Taber's Cyclopedic Medical Dictionary (11th ed. 1970).

be entirely non-existent. In addition, a prosthesis will ordinarily resemble (albeit roughly) the natural part it replaces.[5]

Daw argues that the sheath and sock combination replaces the skin and plantar surface (the sole) of the foot. The skin and the sheath both pass perspiration away from the body, which is necessary for maintaining body temperature. The sock, like the fleshy plantar surface of the foot, cushions the twisting and pounding caused by walking.

■ Whether particular items fit the definition of prosthesis adopted above is a question of fact. Therefore, the trial court's finding that the sheaths and socks are not prostheses will be reversed on appeal only if that finding is clearly erroneous.[6] We find no clear error in the finding of the C.I.T. that, while they aid the body in these ways, the sheath and sock do not *replace* body parts. The trial court's reasoning is extremely sketchy on this point, but that in itself is no basis for overturning the decision. The amputee's body, without the sheath or sock, is capable of perspiring and of absorbing the mechanical pressures of using the artificial limb[7] and the merchandise only *improves* that pre-existing ability. The magnitude of the improvement does not alter the essential point that the merchandise improves rather than replaces. Upon review of the record, therefore, we affirm the finding that the sheath and sock are not prostheses.

### B.

■ The second question is whether, nevertheless, the items are other prosthetic articles. The trial court's finding on this point—that the sheaths and socks are not

other prosthetic articles—was based on its conclusion that the term "other prosthetic articles" only includes other prostheses. The determination of the breadth of meaning is a conclusion of law and thus is not entitled to the deference we exercised above.

We believe that "other prosthetic articles" has a broader meaning than the C.I.T. gave it. Our lodestar is congressional intent and, in the absence of a specific definition, we begin with common meaning.[8] The standard dictionary meaning of "prosthetic" comprises, as one would expect of an adjective, more than prostheses themselves: it refers to (in this case) articles that relate to or pertain to prostheses. While obviously we would not want to stretch that relationship too far, it includes at least items intimately or exclusively used, and intended to be used, with prostheses.

It should be evident that such a definition encompasses these sheaths and socks. They are designed for use with prostheses; they are used specifically to overcome certain problems with prostheses; and they have, as far as the record shows, no other use. We also note that domestic manufacturers of sheaths and socks also refer to their merchandise as "prosthetic." This is strongly indicative of the common usage.

The C.I.T. based its contrary conclusion largely on the statement in the 1969 Summaries of Trade and Tariff Information that "[s]uch replacement parts usually resemble the real ones in appearance."[9] This was error. First, 1969 Summaries of practice under the Tariff Schedules enacted in 1962 are, as the CCPA has recognized, poor indications of the congressional intent in enacting the Schedules.[10] Second, the quot-

---

**5.** *See* United States Tariff Comm'n, Summaries of Trade and Tariff Information, Sched. 7, vol. 2, at 87 (1969).

**6.** *C. Itoh & Co. v. United States,* 678 F.2d 218, 220 (Cust. & Pat.App.1982); *see also Pullman-Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982) (in Fed.R.Civ.P. 52(a), the "clearly erroneous" standard applies to *all* questions of fact).

**7.** The plantar surface analogy is further weakened by the fact that the sheaths and socks are also used for artificial arms.

**8.** *United States v. Rembrandt Elecs., Inc.,* 542 F.2d 1154, 1156, 64 CCPA 1 (Cust. & Pat.App. 1976).

**9.** *See supra* note 5.

**10.** *Volkswagen of America, Inc. v. United States,* 340 F.Supp. 983, 989 (Cust.Ct.1972),

ed statement merely shows that prostheses per se resemble natural parts. Neither it nor the entire passage is inconsistent with the presence of a broad "basket" provision in Item 709.57. The contrary is the case: the Tariff Classification Study—which *preceded* enactment of the Tariff Schedules— describes Item 709.57 as a general provision designed to simplify classification of items previously scattered throughout the Tariff Schedules.[11] We therefore cannot agree that the 1969 Summaries, even if they do suggest a limited meaning, conclude the issue of legislative intent.

The Government's argument based on the Brussels Nomenclature of 1955 is likewise unconvincing. The Government argues that since the Brussels Nomenclature uses the expression " * * * and other artificial parts of the body,"[12] that must be what "other prosthetic devices" in the analogous T.S.U.S. provision means. This reasoning assumes its conclusion that both terms mean the same thing. In fact, Congress used a term different from the Brussels Nomenclature, and this virtually obviates the Brussels Nomenclature's usefulness as legislative history on this issue.[13]

The congressional choice of words has a further and more significant consequence. With the example of the Brussels Nomenclature before it, Congress' choice of the different term suggests an intentional difference in meaning. There is no reason to assume that Congress *said* "other prosthetic articles"—which has a relatively broad common meaning—when it *meant* "other artificial body parts" or "other prostheses" both

of which latter terms were equally available for use in the Tariff Schedules. We conclude that "other prosthetic articles" describes the subject sheaths and socks.

### C.

■ Our final task is to determine whether the original classification of the merchandise as wearing apparel was correct.

The C.I.T. and the parties concentrated their discussions of this issue on case law which maintains that some articles that are worn may nevertheless not be wearing apparel due to their special uses and characteristics.[14] *Admiral Craft Equipment* developed the standard that items are not wearing apparel that go "far beyond that of general wearing apparel."[15] While it is abundantly clear that the sheaths and socks are used exclusively with prostheses and that they are useless otherwise, it is not entirely clear that they provide significantly more, or essentially different, protection than analogous articles of clothing. Virtually all wearing apparel is to a degree (often a high degree) designed and worn to provide comfort and protection, often for very specific situations. The sheaths and socks differ incrementally rather than in kind from other wearing apparel. While the increment may become so very large in some cases that the article is no longer wearing apparel, this is not such a case.[16] In sum, were these the only relevant considerations the presumption of correctness of

*aff'd,* 494 F.2d 703, 704, 61 CCPA 41 (Cust. & Pat.App.1974) (adopting Customs Court opinion).

11. United States Tariff Comm'n, Tariff Classification Study, Sched. 7, at 147 (1960).

12. Brussels Nomenclature, Heading 90.19 and Explanatory Notes (1955).

13. *See Schwarz v. United States,* 417 F.2d 1391, 1394, 57 CCPA 19 (Cust. & Pat.App. 1969); *M.H. Garvey Co. v. United States,* 65 Cust.Ct. 434, 443–44, C.D. 4119 (1970).

14. *Admiral Craft Equip. Corp. v. United States,* 82 Cust.Ct. 162, C.D. 4796 (1979) (lobster bibs

are wearing apparel); *Pompeo v. United States,* 40 Cust.Ct. 362, C.D. 2006 (1958) (crash helmets not wearing apparel); *Best v. United States,* 1 Ct.Cust.App. 49, T.D. 31,009 (1910) (ear caps for prevention of abnormal ear growth not wearing apparel).

15. *Admiral Craft Equip.,* 82 Cust.Ct. at 163.

16. An ice skater, for example, might wear a similar combination of thin nylon sock and thick woolen sock to improve fit, to protect the foot, and to keep perspiration away from the skin.

the Customs' classification [17] would probably require affirmance.

However, that is not the case. Even if the merchandise can be described as wearing apparel, it can also be described as prosthetic articles. General Interpretive Headnote 10(c), T.S.U.S., commands that, of the two possibilities, the more specific must govern. Comparing "provisions of coordinate or equal status," [18] we find that the Service's classification is under Schedule 3, Part 6, Subpart F, "Other women's, girls', or infants' wearing apparel, not ornamented." [19] The coordinate provision of the classification urged by Daw is the heading in Schedule 7, Part 2, Subpart B, quoted at the outset, which includes "artificial limbs, eyes, teeth, and other prosthetic articles." The latter provision is the more specific. The merchandise's specificity of purpose and exclusivity of use, emphasized throughout, compel the conclusion that "other prosthetic articles" describes it far more specifically than does "wearing apparel." We therefore hold that the imported merchandise was not properly classifiable as wearing apparel.

In conclusion, we hold that the sheaths and socks are not prostheses but that they are other prosthetic articles. Further, even if they are describable as wearing apparel they are relatively more specifically described, and are therefore classifiable as, other prosthetic articles. The decision of the Court of International Trade is reversed.

REVERSED.

---

17. 28 U.S.C. § 2639(a)(1) (Supp. V 1981); *United States v. New York Merchandise Co.,* 435 F.2d 1315, 1318, 58 CCPA 53 (Cust. & Pat.App. 1970).

18. General Interpretive Rule 10(c)(ii), T.S.U.S.

19. Headnote 1 of Schedule 3, Part 6, Subpart F, describes Subpart F as "wearing apparel, not specifically provided for, of textile materials."