**Slip Op. 03-142**

**United States Court of International Trade**

| |
|---|
| BAUER NIKE HOCKEY USA, INC., f/k/a BAUER USA, INC.<br><br>              Plaintiff,<br><br>              v.<br><br>UNITED STATES,<br><br>              Defendant. |

Before: Pogue, Judge

Court No. 00-00325

[Defendant's motion for summary judgment granted. Plaintiff's cross-motion for summary judgment denied. Judgment entered for Defendant.]

Decided: October 27, 2003

Burak, Anderson, & Melloni, PLC (Jon T. Alexander, Michael B. Rosenberg) for Plaintiff.

Peter D. Keisler, Assistant Attorney General, John J. Mahon, Acting Attorney in Charge, International Trade Field Office, Amy M. Rubin, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Sheryl A. French, Attorney, Of Counsel, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Bureau of Customs and Border Protection, for Defendant.

**OPINION**

**Pogue, Judge**: Plaintiff, BAUER NIKE Hockey USA Inc., f/k/a Bauer USA, Inc. ("Bauer Nike" or "Plaintiff") challenges a decision of the United States Bureau of Customs and Border Protection ("Customs" or "Defendant")[1] denying Plaintiff's protests filed in

---

[1]Effective March 1, 2003, the United States Customs Service was renamed the United States Bureau of Customs and Border

accordance with section 514 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1514 (2000). At issue is the proper tariff classification under the Harmonized Tariff Schedule of the United States ("HTSUS"), 19 U.S.C. § 1202 (1994), of Plaintiff's imports of ice hockey pants.

Bauer Nike claims that the subject merchandise is classifiable under subheading 9506.99.25, HTSUS, covering "[i]ce-hockey and field-hockey articles and equipment, except balls and skates, and parts and accessories thereof."[2] Goods classifiable under subheading 9506.99.25 were free of duty for the years 1998, 1999, and 2000 during which the subject merchandise was entered at the

_____

Protection. See Homeland Security Act of 2002, Pub. L. No. 107-296 § 1502, 2002 U.S.C.C.A.N. (116 Stat.) 2135, 2308; Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. No. 108-32, at 4 (2003).

[2]Merchandise classifiable under subheading 9506.99.25, HTSUS, includes:

| 9506 | Articles and equipment for general physical exercise, gymnastics, athletics, other sports (including table-tennis) or outdoor games, not specified or included elsewhere in this chapter; swimming pools and wading pools; parts and accessories thereof . . .: |
|---|---|
| . . . | |
| 9506.99 | Other: |
| . . . | |
| 9506.99.25 | Ice-hockey and field-hockey articles and equipment, except balls, and parts and accessories thereof. |

Subheading 9506.99.25, HTSUS (1998).

port of St. Albans, Vermont.

Customs classified the merchandise under a residual or "basket" provision, subheading 6211.33.00, HTSUS, covering "Other garments, men's or boy's . . .: Of man-made fibers."[3]  Goods classifiable under that subheading were subject to duty rates of 16.6% (1998), 16.5% (1999), and 16.4% (2000) ad valorem.

Bauer Nike protested Customs' classification.  In response, Customs' issued Headquarters Ruling ("HQ") 962072 (Aug. 12, 1999), classifying the subject merchandise under subheading 6211.33.00.

Before the Court are cross-motions for summary judgment pursuant to USCIT Rule 56.  The Court has jurisdiction pursuant to 19 U.S.C. § 1515 (1994) and 28 U.S.C. § 1581(a) (1994).  For the reasons that follow, the Court finds that the subject merchandise is properly classified under subheading 6211.33.00, HTSUS, as "[t]rack suits, ski-suits and swimwear; other garments: Other garments, men's or boys' . . .: Of man-made fibers," and grants summary judgment for Defendant.

---

[3]Merchandise classifiable under subheading 6211.33.00, HTSUS, includes:

| 6211 | Track suits, ski-suits and swimwear; other garments: |
| --- | --- |
| . . . | |
| | Other garments, men's or boys' . . . .: |
| 6211.33.00 | Of man-made fibers. |

Subheading 6211.33.00, HTSUS.

**Standard of Review**

Customs' classification is subject to <u>de novo</u> review by this Court pursuant to 28 U.S.C. § 2640.[4]  The Court employs a two-step process in analyzing a customs classification.  "[F]irst, [it] construe[s] the relevant classification headings; and second, [it] determine[s] under which of the properly construed tariff terms the merchandise at issue falls."  <u>Bausch & Lomb, Inc. v. United States</u>, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (citing <u>Universal Elecs., Inc. v. United States</u>, 112 F.3d 488, 491 (Fed. Cir. 1997)).

Interpretation of the tariff classification terms is a question of law, while application of the terms to the merchandise at issue is a question of fact.  <u>Bausch & Lomb, Inc.</u>, 148 F.3d at 1365.  The Court will, nevertheless, consider the reasoning of a Customs' classification ruling, to the degree that the ruling presents the "power to persuade."  <u>United States v. Mead Corp.</u>, 533 U.S. 218, 235 (2001) (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)).

Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  <u>See</u> USCIT Rule 56(d); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Celotex Corp. v. Catrett</u>,

---

[4]As there are no factual disputes as to what constitutes the subject merchandise here, the statutory presumption of correctness is inapplicable to Customs' classification. <u>See</u> <u>Intercontinental Marble Corp. v. United States</u>, 27 CIT __, __ n.3, 264 F. Supp. 2d 1306, 1309 n.3 (2003).

477 U.S. 317, 322 (1986). A dispute is genuine "if the evidence is such that [the trier of fact] could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In a challenge to a tariff classification, summary judgment is appropriate when the dispute involves only the proper classification of the subject merchandise, not the nature of the merchandise itself. Bausch & Lomb, Inc., 148 F.3d at 1365-66. Where there is a dispute about the nature of the subject merchandise, there exists a genuine issue of material fact and a trial is warranted.

## Undisputed Facts

In the instant case, the parties agree that the merchandise at issue is described as "hockey pants," or "ice hockey pants" represented by model numbers HP88, HP100, HP500, HP1000, HP3000 and HP5000. Compl. of Bauer Nike at 2; Pl.'s Resp. to Def.'s Stat. Mat'l Facts para. 1-2; Def.'s Stat. Mat'l Facts para. 1-2; Def.'s Mem. Supp. Mot. Summ. J. at 1 ("Def.'s Mem."). The hockey pants are made entirely of synthetic materials. Pl.'s Resp. to Def.'s Stat. Mat'l Facts para. 3; Def.'s Stat. Mat'l Facts para. 3. "The basic design of the hockey pants is comprised of . . .: an exterior nylon or polyester shell and an assemblage of interconnected hard plastic guards [or plates] surrounded by soft [polyester, nylon or] foam padding . . . attached to a belt beneath the exterior shell

[or pants]."  Laperriere Aff., Pl.'s Ex. 3 at 2; HP5000 (Large) Mat'l Specs, Pl.'s Ex. 6 at 2-3 (indicating that the model's: floating pad is composed of nylon; thigh guard is composed of polyester knit fabric and "P.U. foam;" spinal padding is composed of nylon and polyester as well as other materials; belly pad is composed of nylon and foam; and hip pads and tail pad are composed of polyester as well as other materials); Pl.'s Mem. Supp. Cross-Mot. Summ. J. and Opp'n to Def.'s Mot. Summ. J. at 3 ("Pl.'s Mem."); Def.'s Reply to Pl.'s Opp'n Def.'s Mot. Summ. J. and Resp. Pl.'s Cross-Mot. Summ. J. at 3 ("Def.'s Reply") (stating that Defendant does not dispute Plaintiff's description of "the history, materials, design and injury-reducing properties" of the ice hockey pants).  Additional foam padding is sewn inside the shells of certain models.  Laperriere Aff., Pl.'s Ex. 3 at 2; Def.'s Reply at 3.  The shell of models HP88, HP100, HP500, HP1000 and HP3000 is permanently sewn to the internal belt, guards, and pads, whereas the shell of model HP5000 is attached to the internal belt, guards and pads by a series of metal buttons.  See id.  The belt, guards and pads are interconnected by polyester or nylon straps, webbing, mesh or braiding, see Pl.'s Mem. at 4, in order for the internal belt to hold the guards and pads in the correct position. Laperriere Aff., Pl.'s Ex. 3 at 3; Def.'s Reply at 3.  The internal belt, guards and pads comprise approximately eighty percent of the total weight of the hockey pants, see Def.'s Reply at 3; Pl.'s Mem.

at 5; see also Bauer Nike HP5000 Design Specifications, Pl.'s Ex. 5 (noting that a pair of model HP5000 pants weighs 2.30 kilograms), and are designed to provide protection to the wearer, see Def.'s Resp. to Pl.'s Stat. Mat'l Facts para. 5; Pl.'s Stat. Mat'l Facts para. 6, by absorbing and deflecting blows, collisions, and flying objects.  Pl.'s Mem. at 14; Def.'s Reply at 3.  Plaintiff markets the ice hockey pants under a "protective equipment" category, Pl.'s Stat. Mat'l Facts para. 1; Def.'s Resp. to Pl.'s Stat. Mat'l Facts para. 1; Protective Information Pamphlet (1999), Pl.'s Ex. 10 at 2, but also indicates that the hockey pants have comfort, fit, and ventilation features.  See, e.g., Excerpts of Bauer Nike's Ice Hockey Collection Catalogues, Def.'s Ex. D at 2 (noting that model HP5000 provides "venting in the front of the pant, keeping the player cool.  The result-the player sweats less and therefore less sweat is absorbed by the equipment so it stays light."), 3 (stating that models HP3000's and HP1000's three-piece thigh feature "provides a more comfortable fit"), 4 (advertising the model HP100 as containing "200 deniers lightweight nylon for added comfort," and describing model HP500 as containing spandex and a mesh gusset for "increase[d] stretch and ventilation for added comfort and coolness").[5]

As the parties agree as to the nature and material

---

[5]Defendant, however, avers that an importer's designation of its articles is irrelevant for classification purposes.  See Def.'s Resp. to Pl.'s Stat. Mat'l Facts para. 1.

characteristics of the merchandise, and disagree only as to its proper classification under the HTSUS, summary judgment of the classification issue is appropriate.

## Issue Presented

The two competing headings at issue here are contained in Chapters 62 and 95 of the HTSUS. Chapter 62, encompassed in Section XI ("Textiles and Textile Articles"), covers "[a]rticles of apparel and clothing accessories, not knitted or crocheted," and "applies only to made up articles of any textile fabric other than wadding." Chapter 62, HTSUS. Note 1(t) to Section XI states that the section excludes articles of Chapter 95, or "toys, games, sports requisites and nets." Section XI, Note 1(t), HTSUS. Chapter 95 specifically covers "[t]oys, games and sports equipment; parts and accessories thereof." Chapter 95, HTSUS. Note 1(e) to Chapter 95 explicitly excludes "sports clothing . . . of textiles, of chapter 61 or 62" from classification in that chapter.[6] Chapter 95, Note 1(e), HTSUS.

Accordingly, the central question in this case is whether the subject merchandise constitutes an article of sports clothing that

---

[6]The Notes to Chapter 95 state, in relevant part, that:

1. This chapter does not cover:
     (e) Sports clothing or fancy dress, of textiles, of
     chapter 61 or 62.

Chapter 95, Note 1(e), HTSUS.

is composed "of textiles" and otherwise falls within the purview of chapter 62 as an article of apparel,[7] thereby excluding the merchandise from Chapter 95.

## Parties' Contentions

Plaintiff argues that the ice hockey pants are properly classified as protective sports equipment under Heading 9506. Pl.'s Mem. at 14. In particular, Bauer Nike claims that Customs failed to consider whether the protection afforded by the ice hockey pants was significantly greater or essentially different from that offered by conventional textile trousers. Pl.'s Mem. at 25. Because the hockey pants are composed "predominately" of non-textile materials, including molded plastic guards and foam padding, and are designed to absorb the impact of blows and collisions, Bauer Nike contends that the hockey pants' protective features "go far beyond conventional textile trousers." See Pl.'s Reply Mem. Supp. Cross-Mot. Summ. J. at 14 ("Pl.'s Reply"); Pl.'s Mem. at 24-25, 39. Accordingly, Bauer Nike contends that the hockey pants are no longer wearing apparel. See Pl.'s Mem. at 25, 27. Any aesthetic appeal, comfort, durability or mobility attributable to the hockey pants, in Plaintiff's opinion, is "purely incidental, ancillary or subordinate to their sole function

---

[7]As neither party contends that the subject merchandise is classifiable under chapter 61, discussion is limited to chapter 62.

of protecting players from the severe and unique hazards of ice hockey." Id. at 38.  Bauer Nike also contends that the subject hockey pants are dissimilar from the exemplars provided in Explanatory Note ("Explanatory Note" or "EN") 61.14[8] because the bulk of the hockey pants here is made of foam pads and hard plastic guards, rather than textiles.  See id. at 40-41; Pl.'s Reply at 3. Instead, Bauer Nike maintains that the merchandise at issue is described directly by the exemplars listed in Explanatory Note 95.06(B)(13),[9] because the hockey pants "encompass[] padded or plated articles" and are specially designed to absorb blows and collisions to prevent bone fractures, organ ruptures and other hazards.  Pl.'s Mem. at 41; see Pl.'s Reply at 3-4.  Such features, Bauer contends, are indicative of protective sports equipment.

---

[8]Explanatory Note 61.14 to the Harmonized Commodity Description and Coding System states, in relevant part, that:

> This heading covers . . .
>     (5) Special articles of apparel used for certain sports
>     . . . (e.g., fencing clothing, jockeys' silks, ballet
>     skirts, leotards).

Harmonized Commodity Description and Coding System, EN 61.14 (2d ed. 1996) at 922.

[9]Explanatory Note 95.06 states, in pertinent part, that:

> This heading covers . . .
>     (B) Requisites for other sports and outdoor games . . .
>     e.g.: . . .
>         (13) Protective equipment for sports or games,
>         e.g., fencing masks and breast plates, elbow and
>         knee pads, cricket pads, shin-guards.

EN 95.06 at 1716-17 (emphasis supplied).

Pl.'s Reply at 3 (citing H.I.M./Fathom, Inc. v. United States, 21

CIT 776, 783, 981 F. Supp. 610, 616 (1997)).  Bauer Nike's final

contention is that U.S. Note 12(a) to Subchapter II of Chapter 99

("U.S. Note 12(a)")[10] fails to indicate Congressional intent to

classify ice hockey pants as sports clothing, and as an expired

provision, is inoperative.  See Pl.'s Reply at 7, 9-10.[11]  Plaintiff

---

[10]U.S. Note 12(a) states that:

> 12. (a) For the purposes of subheading 9902.62.01 –
>
> > (1) The term "sports clothing" refers to:
> >
> > > (A) ice hockey pants, provided for in
> > > subheadings 6113.00, 6114.30, 6210.40,
> > > 6210.50, 6211.33 or 6211.43; and
> > >
> > > (B) other articles of sports wearing apparel
> > > which because of their padding, fabric,
> > > construction, or other special features are
> > > specially designed to protect against injury
> > > (e.g., from blows, falls, road burns or
> > > fire).
> >
> > (2) The term "sports clothing" does not include
> > protective equipment for sports or games such as
> > fencing masks and breast plates, shoulder pads,
> > leg guards, chest protectors, elbow and knee pads,
> > cricket pads and shin guards.

U.S. Note 12(a), HTSUS (emphasis supplied).

[11]Plaintiff also argues that each model of the hockey pants
at issue here is a composite good.  Pl.'s Mem. at 22.
Plaintiff's assertion lacks merit.  Because both parties concede
that the hockey pants consist of an exterior shell and an
internal belt, pads and guards, and that those parts can be
purchased separately, see supra pp. 5-6; Bauer Nike Girdle, Style
Vapor 8, Pl.'s Ex. 16, Bauer Nike Shell, Pl.'s Ex. 17, Bauer
Nike, Style Vapor 4, Def.'s Ex. I, the hockey pants here cannot
constitute a composite good.  EN IX to GRI 3(b) at 4
("[C]omposite goods made up of different components shall be
taken to mean not only those in which the components are attached

therefore argues that no deference should be extended to Customs' classification of the subject merchandise.  Pl.'s Mem. at 15.

Customs responds that the subject merchandise was properly classified under Heading 6211.  Def.'s Mem. at 6.  As such, the agency contends that its Headquarters Ruling 962072 is entitled to deference.  Id. at 11.  Because the hockey pants are the "principal mid-body covering worn by a person engaged in playing ice hockey," Def.'s Reply at 26, Customs's first argument is that, even though the hockey pants contain padding and are specially designed and intended for use only while playing the sport of ice hockey, classification is proper under Heading 6211 because the term "garments" clearly and plainly describes the merchandise.  Def.'s Mem. at 14-15.  The hockey pants are "garments," Customs argues, because the pants are worn as the outermost layer covering the body and provide the wearer with, in addition to protection, decency, fit, comfort, ventilation, and style.  Id. at 19; Def.'s Reply at 23.  Next, Customs claims that Note 1(e) to Chapter 95 expressly excludes "all sports clothing" from classification in that chapter, regardless of the level of protection extended to the wearer, Def.'s Reply at 8 (emphasis supplied); consequently, the hockey pants at issue are also excluded from classification in Chapter 95.

---

to each other to form a practically inseparable whole but also those with separable components, provided these components are adapted one to the other and are mutually complementary and that together they form a whole which would not normally be offered for sale in separate parts.") (emphasis supplied).

Def.'s Mem. at 20-22.  Defendant's next contention is that the exemplars in Explanatory Note 95.06 (B)(13) are not ejusdem generis with the imported hockey pants.  Def.'s Reply at 26.  Rather, Customs contends that the hockey pants are similar to "fencing clothing," an exemplar provided in Explanatory Note 61.14, because both articles are special articles of apparel only used while participating in a certain sport and contain protective features. See Def.'s Mem. at 20-21.  As such, Customs argues that the merchandise is classifiable as "sports clothing" under Chapter 62. See id. at 20. Last, Customs relies on U.S. Note 12(a) as evidence of Congressional intent that ice hockey pants are sports clothing classifiable under Chapter 62.  Def.'s Reply at 24.

**Discussion**

The HTSUS consists of (1) the General Notes; (2) the General Rules of Interpretation ("GRI"); (3) the Additional U.S. Rules of Interpretation; (4) sections I through XXII (encompassing chapters 1 through 99, including all section and chapter notes, article provisions, and tariff and other treatment accorded thereto); and (5) the Chemical Appendix.  Classification of goods under the HTSUS is governed by the General Rules of Interpretation ("GRI").  See Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999); Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998).

GRI 1 states that "for legal purposes, classification shall be

determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS; see also Orlando Food Corp., 140 F.3d at 1440. Goods that cannot be classified solely by reference to GRI 1 must be classified by reference to the succeeding GRIs in numerical order. See N. Am. Processing Co. v. United States, 236 F.3d 695, 698 (Fed. Cir. 2001). Thus, if the application of GRI 1 provides the proper classification, the Court may not consider any subsequent GRI. Mita Copystar Am. v. United States, 160 F.3d 710, 712 (Fed. Cir. 1998) ("Mita I"). Furthermore, "[a]bsent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." Carl Zeiss, Inc., 195 F.3d at 1379 (citation omitted).

The Court may also refer to the Explanatory Notes, which constitute the World Customs Organization's official interpretation of the HTSUS. See Baxter Healthcare Corp. of Puerto Rico v. United States, 22 CIT 82, 89 n.4, 998 F. Supp. 1133, 1140 n.4 (1998). Although the Explanatory Notes are not legally binding, they are useful in ascertaining the correct classification of the merchandise in question. See Rollerblade, Inc. v. United States, 112 F.3d 481, 486 n.3 (Fed. Cir. 1997) (stating that the Explanatory Notes are "intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting its subheadings") (citing Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994) ("Mita II") (citation omitted)); see also Lonza,

Inc. v. United States, 46 F.3d 1098, 1109 (Fed. Cir. 1995) ("While the Explanatory Notes do not constitute controlling legislative history, they do offer guidance in interpreting the HTS[US] subheadings.") (citation omitted).  Determining which heading provides the most appropriate classification of merchandise requires close textual analysis of the language of the headings and the accompanying explanatory notes.

As noted above, in this case, the critical distinction between the two alternative Headings, 6211 and 9506, is provided by Note 1(e) to Chapter 95, which excludes sports clothing from classification in that chapter and hence under Heading 9506.  The phrase "sports clothing, . . . of textiles, of chapter 61 or 62," is not defined within the HTSUS or by the relevant legislative history.  Based on a plain reading of the statutory language, the provision encompasses textile articles of "sports clothing" that are classifiable as wearing apparel under Chapter 62.  See Rubie's Costume Co. v. United States, 337 F.3d 1350, 1356 (Fed. Cir. 2003). Because the parties admit that the outer covering or shell of the ice hockey pants is made exclusively of nylon and polyester, several of the internal pads are partially composed of nylon or polyester and the belt, guards, and pads are internally interconnected by polyester or nylon straps, webbing, mesh or braiding, supra pp.5-6, the merchandise is made "of textiles."[12]

_____

[12]Nothing in the language of the phrase "of textiles" requires that the textile portion predominate, particularly in

The Court must therefore determine whether the ice hockey pants are (1) articles of sports clothing (2) classifiable as wearing apparel under Chapter 62.

### A. "Sports Clothing"

Neither the HTSUS nor its legislative history defines the term "sports clothing." "When a tariff term is not defined in either the HTSUS or its legislative history, the term's correct meaning is its common meaning." Mita II, 21 F.3d at 1082 (citing Lynteq, Inc. v. United States, 976 F.2d 693, 697 (Fed. Cir. 1992)). The Court, in construing tariff terms, "may rely upon its own understanding, dictionaries and other reliable sources." Medline Indus., Inc. v. United States, 62 F.3d 1407, 1409 (Fed. Cir. 1995) (citation omitted).

_____

terms of composition by weight (otherwise those requirements, as in other provisions of the HTSUS, would be specified), although certainly the characteristic must not be incidental. While Plaintiff does not directly claim that the ice hockey pants are not "of textiles," Plaintiff makes a related argument in discussing the exemplars of Chapter 62. Infra subsection B. There, Plaintiff argues that the ice hockey pants are dissimilar from the exemplars of that chapter, i.e., "fencing clothing, jockeys' silks, ballet skirts, [and] leotards," EN 61.14 at 922, because those items are entirely made of textiles, whereas the merchandise here is, in Plaintiff's opinion, "predominately" made of foam padding and plastic guards. Plaintiff has presented uncontradicted evidence indicating that the internal belt, pads and guards portion of the hockey pants weigh more than the shell portion. This evidence is not problematic, however, because Plaintiff concedes that the shell or pants as well as several internal pads are made partially of nylon or polyester and that the belt, guards and pads are interconnected by polyester or nylon straps, webbing, mesh or braiding. Accordingly, the phrase "of textiles" is satisfied under a plain reading.

In H.I.M./Fathom, Inc. v. United States, the Court defined "clothing" as a "'covering for the human body or garments in general: all the garments and accessories worn by a person at any one time.'" 21 CIT at 781, 981 F. Supp. at 615 (quoting Webster's Third New International Dictionary 428 (1993)). Because clothing is defined as a "garment," and neither the HTSUS nor its legislative history defines that term, it is necessary to ascertain its common meaning. The Court has defined the term "garment" as "'an article of outer clothing (as a coat or dress) usu. exclusive of accessories.'" H.I.M./Fathom, Inc. v. United States, 21 CIT at 781, 981 F. Supp. at 615 (quoting Webster's Third New International Dictionary 936). Thus, based on a common understanding of the term "sports," the Court finds that "sports clothing" is defined as outer coverings or articles worn on the body while participating in sports.

The ice hockey pants here undeniably constitute articles of "sports clothing," as the merchandise is worn on the human body as pants exclusively while participating in the sport of ice hockey. Accordingly, the Court finds that the ice hockey pants at issue are articles of "sports clothing." The question remains, however, whether the textile ice hockey pants are classifiable as wearing apparel under Chapter 62, thereby triggering the preclusive effect of Note 1(e) to Chapter 95. See Rubie's Costume Co. v. United States, 337 F.3d at 1357.

**B. "Wearing Apparel" under Chapter 62**

The Federal Circuit recently defined the term "wearing apparel" in <u>Rubie's Costume Co. v. United States</u>, 337 F.3d at 1357, indicating that the term is "'not an uncommon one in statutes, and is used in an inclusive sense as embracing all articles which are <u>ordinarily</u> worn — dress in general.'" <u>Id.</u> (quoting <u>Arnold v. United States</u>, 147 U.S. 494, 496 (1893) (defining "wearing apparel" under the predecessor classification statute, the Tariff Schedules of the United States ("TSUS")) (emphasis supplied)). The circuit court further defined "wearing apparel" as "'clothes or coverings for the human body worn for decency or comfort[,] and common knowledge indicates that adornment is also an element of . . . wearing apparel.'" <u>Rubie's Costume Co.</u>, 337 F.3d at 1357 (quoting <u>Antonio Pompeo v. United States</u>, 40 Cust. Ct. 362, 364 (1958)).

Plaintiff sets forth two additional definitions of the term "wearing apparel" as defined under the TSUS. <u>See</u> Pl.'s Mem. at 26. The first defines "wearing apparel" as articles worn not only "for reasons of decency, comfort, or adornment but also 'for protection against the elements and those worn for protection against more localized conditions prevailing in the environment of the home, workplace, school, or restaurant.'" <u>Id.</u> (quoting <u>Admiral Craft Equip. Corp. v. United States</u>, 82 Cust. Ct. 162, 163 (1979) (dismissing plaintiff's argument that wearing apparel does not cover articles worn by humans essentially for protective purposes as "obviously incorrect")). The second definition adds that "'all

wearing apparel is to a degree (often a high degree) designed and worn to provide comfort and protection, often for very specific situations.'" Pl.'s Mem. at 26 (quoting Daw Indus., Inc. v. United States, 714 F.2d 1140, 1143 (Fed. Cir. 1983)).

Because the subject merchandise also must be classifiable under Chapter 62, the scope of that chapter must be examined. Explanatory Note 61.14, which applies mutatis mutandis to garments covered by Heading 6211, provides that the heading also includes, "[s]pecial articles of apparel used for certain sports or for dancing or gymnastics (e.g., fencing clothing, jockeys' silks, ballet skirts, [and] leotards)." EN 61.14 at 922. Customs interprets this language narrowly, stating that "the term 'certain' limits the scope of . . . [H]eading [6211] to those articles of sporting apparel which, protective or otherwise, are as a general matter, worn only while engaging in the activity for which they were designed." Pl.'s Ex. 22, HQ 086973 (Apr. 30, 1990); see also HQ 951640 (July 16, 1992) (same); Def.'s Ex. J, HQ 951627 (Aug. 14, 1992) (stating that Heading 6114 "does not cover all wearing apparel which could be worn for sports, but only those sports clothes which are specially designed to be worn in a particular sport and which would not ordinarily be worn any other time"). For example, Customs has explained that "while football pants or baseball knickers might be classifiable in [H]eading 6211, such articles as tennis or rugby shorts, which are often worn off the court or playing field, would most likely not be so classifiable."

Pl.'s Ex. 22, HQ 086973 (Apr. 30, 1990). Accordingly, it appears that an article of clothing is classifiable under Chapter 62 as a "special article[] of apparel used for certain sports" if the article is ordinarily worn on the human body, specially designed for a specific sport, and limited in use to that sport as evidenced by the construction of the garment. Def.'s Ex. K, HQ 957469 (Nov. 7, 1995); see also HQ 951640 (July 16, 1992) (classifying ice hockey official's pants under Heading 6114 because the pants were sports clothing and only worn while engaging in the sport, as evidenced by the fact that the pants were sized proportionally to the protective equipment worn underneath the pants).

The Court has further recognized that Chapter 62, HTSUS, also includes articles of apparel strictly worn for protective purposes. H.I.M./Fathom, 21 CIT at 782 n.3, 981 F. Supp. at 616 n.3. In H.I.M./Fathom, the Court acknowledged that "the garment provisions of the HTSUS include certain items the principal use of which is not comfort and adornment." Id. For example, the garment provisions cover "'[n]onwoven disposable apparel designed for use in . . . contaminated areas,' [articles] obviously not worn for pure decency, comfort or adornment but for protection." See id.; see also Def.'s Ex. M, HQ 959595 (Mar. 24, 1999) (classifying chainsaw protective vest containing an outer nylon shell coated in polyurethane and internal layers of pads comprised of polyester, polypropylene, and nylon as "other garments" because the vest provided protection to the wearer from particular hazards

encountered in specific occupations, and was similar to the types of clothing named in the explanatory note to Heading 6211).

Accordingly, in the instant case, the hockey pants constitute articles of wearing apparel. The hockey pants are ordinarily worn as an outer covering on the body for comfort, fit, ventilation, and protective purposes only while participating in the sport of ice hockey. Moreover, the ice hockey pants are classifiable under Chapter 62. Because neither party disputes that the merchandise at issue is only used while engaging in ice hockey, as evidenced by the merchandise's protective, comfort, and ventilation features, and that the merchandise is specially designed for use in the sport of ice hockey, the ice hockey pants are "special articles of apparel used for certain sports." The merchandise at issue here is therefore covered by the express language of Heading 6114, and consequently, Heading 6211.

Contrary to Bauer Nike's contention, in light of the fact that the Court finds the hockey pants are special articles of apparel used for a certain sport, the subject merchandise is similar to the exemplars provided in Explanatory Note 61.14. In particular, the Court is not persuaded by Plaintiff's argument that because the bulk of the hockey pants is made of foam pads and hard plastic guards, rather than textiles, the merchandise at issue is dissimilar from the exemplars provided therein. Plaintiff's own evidence undermines its argument. While Plaintiff presented uncontradicted evidence that the internal belts, pads, and guards

compose eighty percent of the merchandise's weight, Bauer Nike also submitted evidence indicating that the belt, pads and plates are held together by nylon or polyester straps, webbing, mesh or braiding.  Moreover, several of the internal pads are made partially of nylon or polyester.  Last, the shell or outer covering is made entirely of textiles.  Such evidence casts doubt on Plaintiff's claim that the hockey pants are "predominately" made of foam pads and plastic guards.

Furthermore, like the hockey pants here, one of the exemplars, fencing clothing, also contains a protective feature that includes padding.  Specifically, the "plastron" contains an internal textile pad covered by an outer textile material.  Def.'s Ex. H, Clothing at 2 <u>available</u> <u>at</u> http://sitka.triumf.ca/morgan/faq_2.1.html (noting that a "plastron" is an article of fencing clothing); <u>The American Heritage Dictionary of the English Language</u> 1386 (3d ed. 1996) (defining "plastron" as "[a] quilted pad worn by fencers to protect the torso and side").  Because both articles contain an internal pad covered by a textile fabric, the two articles are similarly constructed.

In determining whether the hockey pants are "wearing apparel," Bauer Nike further contends that the Court must consider whether the protective functions of the subject merchandise go "far beyond that of general wearing apparel," such that the ice hockey pants are no longer wearing apparel for classification purposes.  <u>See</u> Pl.'s Mem. at 27 (citation omitted).  Such an inquiry, according to

Bauer Nike, requires that the Court consider whether the ice hockey pants "provide significantly more, or essentially different, protection than analogous articles of clothing." Id. at 28 (citation omitted). Plaintiff relies on case law and various Customs' ruling letters to support its contention. Id. at 27-29; Pl.'s Reply at 13.[13]

The Court finds Bauer Nike's argument lacks merit for several reasons. First, the determinations on which Bauer Nike relies fail

---

[13]In particular, Plaintiff cites to the following determinations: Admiral Craft Equip. Corp., 82 Cust. Ct. at 163; Dynamics Classics, Ltd. v. United States, 10 CIT 666 (1986); Daw Indus., Inc., 714 F.2d at 1143-44 (finding sheaths and socks used exclusively with prostheses were classifiable as other prosthetic articles, rather than "wearing apparel" under the TSUS); Pl.'s Ex. 23, HQ 965312 (Jan. 14, 2002) (concluding that buoyancy compensators were "dive equipment" under Heading 9506, rather than "wearing apparel" under Heading 6210, because the compensator's use went "far beyond that of a typical jacket or vest," the warmth and protection features were ancillary to the buoyancy function, and prior precedent of the Court classified scuba diving equipment under subheading 9506.29.0040, but noting that note 1(e) to Chapter 95 did "not operate to exclude [the merchandise] from Chapter 95 because . . . compensators [we]re not clothing"); Pl.'s Ex. 24, HQ 965196 (Nov. 21, 2001) (same); Pl.'s Ex. 27, HQ 952204 (Apr. 12, 1993) (classifying a swim sweater under Heading 6307 as other articles made up of textiles rather than a garment under Heading 6114)); Pl.'s Ex. 34, HQ 960166 (Aug. 28, 2002) (finding that a textile swimming aid was a garment classifiable under Heading 6112, rather than other made up articles of textiles under Heading 6307); Pl.'s Ex. 35, HQ 965313 (Jan. 14, 2002) (concluding that buoyancy compensators were "dive equipment" under Heading 9506, rather than "wearing apparel" under Heading 6211, because the compensator's use went "far beyond that of a typical jacket or vest," but noting that note 1(e) to Chapter 95 "does not operate to exclude [the merchandise] from Chapter 95 because . . . compensators [we]re not clothing"); Pl.'s Ex. 36, HQ 952483 (May 27, 1993) (classifying personal buoyancy vests under Heading 6307 as other made up articles, rather than a garment).

to assist the Court in adjudicating the legal issue presented here because they were developed in a different context. While each of the cited determinations discussed the term "wearing apparel," and the articles classified therein provided some degree of protection to the wearer, none of the determinations explain whether the merchandise at issue there constituted articles of "sports clothing" classifiable as wearing apparel under Chapter 61 or 62. E.g., Admiral Craft Equip. Corp., 82 Cust. Ct. at 162-63 (discussing whether disposal plastic aprons and lobster bibs were classifiable as "plastic wearing apparel" or "other plastic articles not specially provided for" under the TSUS); Dynamics Classics, Ltd., 10 CIT at 667 (analyzing whether plastic exercise suits chiefly used for weight and girth reduction were classifiable as plastic "wearing apparel" or "other [plastic] articles not specially provided for" under the TSUS). The Court therefore finds it unnecessary to apply Plaintiff's proffered "wearing apparel" test.

Here, Customs' interpretation of the relevant provisions at issue is consistent with previous classification determinations of similar articles of sports clothing identified as hockey pants or ice hockey pants. See, e.g., NY A87152 (Sept. 9, 1992) (classifying ice hockey pants composed of woven nylon fabric, a textile belt, and padding in the leg and above the waist as sports clothing under Note 1(e) to Chapter 95); Pl.'s Ex. 22, HQ 086973 (Apr. 30, 1990) (classifying ice hockey pants composed of nylon and

internal padding as sports clothing under Note 1(e) to Chapter 95 and Heading 6114 because the pants were only worn while engaging in ice hockey). Consequently, neither the Supreme Court's articulation nor the three cases which further develop the "wearing apparel" standard supports the application of Plaintiff's proffered test here.

Accordingly, the Court concludes that the ice hockey pants are sports clothing classifiable as wearing apparel under Chapter 62. Note 1(e) to Chapter 95 therefore precludes classification of the subject merchandise from that chapter.

## C. Articles of Equipment Classifiable under Chapter 95

The Court further finds Plaintiff's arguments that the ice hockey pants are articles of protective sports equipment classifiable under Heading 9506, HTSUS, unpersuasive. Heading 9506 covers "[a]rticles and equipment for general physical exercise, gymnastics, athletics, other sports (including table-tennis) or outdoor games, not specified or included elsewhere in this chapter; swimming pools and wading pools; parts and accessories thereof." Customs' has interpreted this heading as encompassing "apparatus for use while engaging or participating in the sport; a physical necessity for the sport." HQ 951640 (July 16, 1992). Customs has noted, however, that Heading 9506 "embraces only certain forms of protective gear, and that sports clothing, regardless of the protection they afford the wearer, is still excluded." NY A87152

(Sept. 9, 1992).

The term "equipment" must also be defined in accordance with its common meaning, as the term is not defined by either the HTSUS or its legislative history.  The Court has defined "equipment" as "'Something with which a person, an organization, or a thing is equipped;' 'equip,' in turn, is defined as 'To supply with necessities such as tools or provisions.'"  Rollerblade, Inc. v. United States, 24 CIT 812, 819, 116 F. Supp. 2d 1247, 1255 (2000) (quoting The American Heritage Dictionary at 622 (1996)), aff'd 282 F.3d 1349, 1354 (Fed. Cir. 2002); see also Webster's Third New International Dictionary 440 (defining "equipment" as "the equipping of a person or thing" and "equip" as "to provide with what is necessary, useful, or appropriate").  More recently, the Federal Circuit has defined "equipment" as "those articles that are necessary and specifically designed for use in athletics and other sports."  See Rollerblade, Inc. v. United States, 282 F.3d at 1354. Customs has ruled that equipment "includes the requisites needed in connection with the play of sports and athletics, that being the equipment essential to the play of the game, sport or athletic activity or the equipment designed for use by the player in the training, practice and conduct of . . . sporting activities."  NY D85049 (Dec. 14, 1998) (emphasis added).  Equipment also plainly encompasses articles containing protective features.  See EN 95.06(B)(13) at 1716-17 ("Requisites for other sports and outdoor games . . . e.g.: (13) Protective equipment for sports or games,

e.g., fencing masks and breast plates, elbow and knee pads, cricket pads, shin guards.") (emphasis supplied); see also Slazengers, Inc. v. United States, 33 Cust. Ct. 338, 339 (1954) (articles that serve "no other purpose but to aid in a safer and more efficient game . . . are within the designation of 'equipment.'"); HQ 956582 (Mar. 14, 1995) (classifying wrist protectors designed to perform a protective function as sports equipment, rather than sports clothing, under Heading 9506).

While the hockey pants provide protection to the wearer, and are specially designed for use in the sport of ice hockey, Plaintiff concedes that it is possible to engage in the sport of ice hockey without wearing the merchandise in question. Pl.'s Resp. to Def.'s Stat. Mat'l Facts para. 8. As such, the Court finds that the subject merchandise is not essential or necessary for participation in that sport. Consequently, Plaintiff's ice hockey pants are not articles of sports equipment, and are therefore not classifiable as such.

Bauer Nike's reliance on the exemplars provided in Explanatory Note 95.06(B)(13) to support its argument is also misplaced. Explanatory Note 95.06(B)(13) explains that "[p]rotective equipment for sports or games, [includes] fencing masks and breast plates, elbow and knee pads, cricket pads, [and] shin-guards." EN 95.06(B)(13) at 1717. While the hockey pants contain internal padding and guards, requisite materials for classifying merchandise as "protective equipment," H.I.M./Fathom, Inc., 21 CIT at 783, 981

F. Supp. at 616 (noting that "equipment such as padding and guards" are included in chapter 95), unlike the exemplars, the pads and guards here are contained within an outer nylon or polyester shell or pant.  Therefore, the hockey pants are constructed differently from the exemplars of Explanatory Note 95.06(B)(13).  HQ 083859 (Apr. 25, 1989) (distinguishing ice hockey pants composed of an outer and inner shell in addition to internal padding sewn inside the article and a belt from the exemplars listed in Explanatory Note 95.06(B)(13) because the exemplars "may not be contained in an article of sports clothing to be included in chapter 95.  [The exemplars] must be separate and apart from another article."); see also HQ 084622 (June 21, 1989) (same), revoked on other grounds by HQ 956289 (June 20, 1994).  Consequently, the exemplars provided in Explanatory Note 95.06(B)(13) are distinguishable from the hockey pants at issue.

The Court is also not convinced that the type of protection afforded by the exemplars and the subject merchandise, alone, establishes that the ice hockey pants are ejusdem generis with the exemplars of sports equipment.  Even though Customs has previously held that "sports protective equipment intended for inclusion within Heading 9506 . . . [includes] equipment having protective features with the sole or primar[]y function of directly absorbing the impact of blows, collisions or flying objects," Pl.'s Ex. 28, HQ 965236 (Dec. 5, 2001); see also Pl.'s Ex. 29, NY H87701 (Mar. 11, 2002), Pl.'s Ex. 31, NY D83060 (Oct. 6, 1998), those decisions

did not consider the legal issue presented here, i.e., whether the subject merchandise constitutes sports clothing that is classifiable as wearing apparel under Chapter 62. In fact, Customs has previously classified similar articles presenting the same legal issue as well as affording the same protections as the merchandise in question here as sports clothing under Chapter 62. See, e.g., NY A87152 (Sept. 9, 1992) (classifying ice hockey pants); Pl.'s Ex. 22, HQ 086973 (Apr. 30, 1990) (classifying analogous articles identified as hockey pants). The Court is therefore not persuaded by Bauer Nike's contention.

Last, U.S. Note 12(a) lends further support for the conclusion that the subject merchandise is not classifiable under Chapter 95 of the HTSUS as "sports equipment." U.S. Note 12(a) states that the term "sports clothing" contained in subheading 9902.62.01 refers to "ice hockey pants, provided for in subheadings 6113.00, 6114.30, 6210.40, 6210.50, 6211.33, or 6211.43" and "other articles of sports wearing apparel which because of their padding, fabric, construction, or other special features are specially designed to protect against injury (e.g., from blows, falls, road burns or fire)." U.S. Note 12(a), HTSUS (emphasis omitted).[14] Subheading

---

[14]Subheading 6113.00 covers "[g]arments, made up of knitted or crocheted fabrics of [H]eading 5903, 5906 or 5907." Subheading 6113.00, HTSUS. Heading 5903 includes "[t]extile fabrics impregnated, coated, covered or lamented with plastics." Heading 5903, HTSUS. Heading 5906 encompasses "[r]ubberized textile fabrics, other than those of [H]eading 5902." Heading 5906, HTSUS. Subheading 5907.00 covers "[t]extile fabrics otherwise impregnated, coated or covered: painted canvas being

9902.62.01, a provision which expired on December 31, 1992, provided a temporary duty rate reduction to articles of "[s]ports clothing, however provided for in chapters 61 and 62." See subheading 9902.62.01, HTSUS; Customs and Trade Act of 1990, Pub. L. No. 101-382, § 426, 1900 U.S.C.C.A.N. (104 Stat.) 629, 688-89. The temporary rate permitted articles of "sports clothing" to enter the U.S. duty free, or at the "rate of duty that . . . applied to such articles under the [TSUS]." See id. Prior to the conversion into the HTSUS on January 1, 1989, articles of "sports clothing" as specifically defined above were generally classified as sports "equipment" under the TSUS and afforded duty free tariff treatment. See id.; Mem. from U.S. Int'l Trade Comm. to The Committee on Finance of the United States Senate, S.718, 101st Congress, A Bill to Amend the Harmonized Tariff Schedule of the United States to Provide Duty-Free Treatment for Certain Sports Clothing, Def.'s Ex. N at 1, 4. It can logically be concluded, in light of the fact that Congress enacted a temporary duty rate reduction after the conversion into the HTSUS, that the articles explicitly defined in

---

theatrical scenery, studio back-cloths or the like." Subheading 5907.00, HTSUS. Subheading 6114.30 covers "[o]ther garments, knitted or crocheted: Of man-made fibers." Subheading 6114.30, HTSUS. While subheading 6210.40 encompasses "[o]ther men's or boys' garments: Of man-made fibers," subheading 6210.50 covers "[o]ther women's or girls' garments: Of man-made fibers." Subheading 6210.40, HTSUS; subheading 6210.50, HTSUS. Subheading 6211.33 covers "[o]ther garments, men's or boys': Of man-made fibers," and subheading 6211.43 encompasses "[o]ther garments, women's or girls': Of man-made fibers." Subheading 6211.33, HTSUS; subheading 6211.43, HTSUS.

U.S. Note 12(a) as "sports clothing," including ice hockey pants, endured a change in classification under the HTSUS. To conclude otherwise would render the effect of the temporary duty rate reduction meaningless, as imports of equipment entered the U.S. duty free during the effective dates of that rate reduction. See, e.g., subheading 9506.99.25, HTSUS (1990). Although U.S. Note 12(a) is legally inoperative, see The Reform, 70 U.S. 617, 629 (1865) ("[A] statute, temporary in its terms, cannot be enforced after the statute has expired."), and therefore has no binding effect on the Court, the note suggests that "sports clothing" as defined therein is not classifiable as "equipment" under the HTSUS.[15]

**Conclusion**

Because the ice hockey pants in question are articles of sports clothing classifiable as wearing apparel under Chapter 62, the Court finds that the subject merchandise is expressly precluded from classification in Chapter 95 under Note 1(e) to that chapter.

---

[15]The Court is also not persuaded by Plaintiff's reliance on two foreign classification decisions from Canada and the European Union. Pl.'s Ex. 32; Pl.'s Ex. 33. The decisions proffered by Plaintiff fail to define the legal terms at issue in this case, i.e., "sports clothing" and "equipment." Rather, the decisions merely determine that the merchandise there was equipment. See Sarne Handbags Corp. v. United States, 24 CIT 309, 316 n.16, 100 F. Supp. 2d 1126, 1133 n.16 (2000). Furthermore, as the decisions apply the local tariff provisions of the country rendering the determination, they fail to assist the Court in interpreting the tariff terms at issue here under the HTSUS.

Accordingly, Customs correctly classified Bauer Nike's ice hockey pants under subheading 6211.33.00, HTSUS.[16]  As such, Bauer Nike's motion for summary judgment is denied.  In turn, Customs' motion for summary judgment is granted, and judgment will be entered for Defendant.

                                     Donald C. Pogue
                                         Judge

Dated:     October 27, 2003
           New York, New York

---

[16]Plaintiff contends, in the alternative, that the merchandise should be classified under a GRI 3 analysis.  Pl.'s Mem. at 20, 22.  Because the Court classified the subject merchandise under GRI 1, the Court cannot reach this argument. See Mita I, 160 F.3d 710, 712 (Fed. Cir. 1998).